Marianne Dugan, *pro hac vice*
        (Oregon State Bar # 93256)
Internet e-mail address mdugan@mdugan.com
Attorney at Law
259 E. 5th Ave., Suite 200-D
Eugene, OR 97401
Telephone (541) 338-7072
Facsimile (866) 650-5213
        Counsel for Plaintiffs

Sharon Duggan, CSB #105108
Internet e-mail address foxsduggan@aol.com
370 Grand Ave., Ste 5
Oakland, CA 94610
Telephone (510) 271-0825
Facsimile (510) 271-0829
        On the brief only as Local Counsel for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

KARUK TRIBE; KLAMATH-SISKIYOU
WILDLANDS CENTER; ENVIRONMENTAL
PROTECTION INFORMATION CENTER; and
KLAMATH FOREST ALLIANCE,

      Plaintiffs,

      v.

TYRONE KELLEY, in his capacity as Forest
Supervisor, Six Rivers National Forest; and
UNITED STATES FOREST SERVICE,

      Defendants.

CASE NO. CV-10-2039 WHA

PLAINTIFFS' MEMORANDUM IN
SUPPORT OF MOTION FOR SUMMARY
JUDGMENT

HEARING JUNE 9, 2011, 10:00,
COURTROOM 9

ORAL ARGUMENT REQUESTED

PAGE i - PLAINTIFFS' MEM. IN SUPP. OF MO. FOR SUMM. JMT - CV-10-2039 WHA

1

# TABLE OF CONTENTS

2    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

3    I.    FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

4          A.    The Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

5          B.    The Project . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

6          C.    The NHPA and the Panamniik World Renewal Ceremony District . . . . . . . . . . 2

7          D.    The Environment Affected by the Project . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

8          E.    The Collaborative Partnership . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

9          F.    The Draft EIS and Plaintiffs' Comments . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

10         G.    The Final EIS, Objection/Resolution Process, and Record of Decision (ROD) . . 6

11         H.    Defendants' "Programmatic Agreement" with the SHPO . . . . . . . . . . . . . . . . . 7

12         I.    Implementation of the Project . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

13   II.   STANDARD FOR SUMMARY JUDGMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

14   ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

15   I.    PLAINTIFFS HAVE STANDING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

16   II.   THE OCFR PROJECT VIOLATES THE NATIONAL HISTORIC PRESERVATION
           ACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
17
           A.    The Provisions of the NHPA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
18
                 1.    The NHPA applies to the OCFR project . . . . . . . . . . . . . . . . . . . . . . 11
19
                 2.    The general requirements of the NHPA . . . . . . . . . . . . . . . . . . . . . . . 12
20
                 3.    NHPA requirements regarding Indian tribes . . . . . . . . . . . . . . . . . . . . 13
21
           B.    Defendants Violated the NHPA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
22
                 1.    Defendants failed to consult with the SHPO regarding the project . . . . . 14
23
                 2.    Defendants did not evaluate and mitigate the impacts to the eligible
                       areas . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
24

3.  Defendants never updated the record regarding eligibility . . . . . . . . . . 17

4.  Defendant did not even follow the provisions of the Programmatic
    Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

III.  THE OCFR PROJECT VIOLATES NEPA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    A.  Defendant Failed to Prepare a Supplemental EIS (SEIS) . . . . . . . . . . . . . . . . . 18

        1.  NEPA requires an SEIS when new information regarding impacts comes
            to light . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        2.  The project implementation is outside the scope of analysis and record of
            decision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    B.  Defendant Failed to Adequately Disclose and Analyze the Project's
        Environmental Impacts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

    C.  The Project Fails to Meet Its Stated Purpose and Need . . . . . . . . . . . . . . . . . . 21

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

1

# TABLE OF AUTHORITIES

2

**CASES**

3

Apache Survival Coalition v. United States, 21 F.3d 895 (9th Cir. 1994)  . . . . . . . . . . . . . . . . 12

4

Bowen v. American Hosp. Ass'n, 476 U.S. 610, 106 S. Ct. 2101 (1986) . . . . . . . . . . . . . . . . 10

5

Hoonah Indian Ass'n v. Morrison, 170 F.3d 1223 (9th Cir. 1999)  . . . . . . . . . . . . . . . . . . . . . 12

6

Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 335 (1977)  . . . . . . . . . . . . . 11

7

Idaho Sporting Congress v. Thomas, 137 F.3d 1146 (9th Cir. 1998)  . . . . . . . . . . . . . . . . . . . 11

8

Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 109 S. Ct. 1851 (1989)  . . . . . . . 18

9

Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 103 S.
Ct. 2856 (1983)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

10

Ocean Advocates v. U.S. Army Corps of Engineers, 361 F.3d 1108 (9th Cir. 2004) . . . . . . . . 10

11

Oliver v. Keller, 289 F.3d 623 (9th Cir. 2002)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

12

Pit River Tribe v. U.S. Forest Service, 469 F.3d 768 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . 11

13

Rumsfeld v. Forum for Academic and Institutional Rights, Inc., 547 U.S. 47, 126 S. Ct. 1297
(2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

14

T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n., 809 F.2d 626 (9th Cir. 1987) . . . . . 10

15

16

**STATUTES**

17

5 U.S.C. 551-706 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

18

5 U.S.C. 706 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

19

16 U.S.C. 470 et seq. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 12

20

16 U.S.C. 470-470W-6 9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

21

16 U.S.C. 470a(d)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

22

16 U.S.C. 470f . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

23

16 U.S.C. 6512(b)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2

24

16 U.S.C. 6514(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

28 U.S.C. 2412 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

42 U.S.C. 4321-4370(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

42 U.S.C. 4332(2)(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 21

**REGULATIONS**

36 C.F.R. 800.4 -.9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

36 C.F.R. 800.5 -11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 16

36 C.F.R. 800.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

36 C.F.R. 800.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12-15

36 C.F.R. 800.3(f)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

36 C.F.R. 800.4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13, 17

36 C.F.R. 800.5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

36 C.F.R. 800.6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 17

36 C.F.R. 800.8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

36 C.F.R. 800.9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

36 C.F.R. 800.11(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 15

36 C.F.R. 800.16(l) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

36 C.F.R. 800.16(y) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

40 C.F.R. 1502.9(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

40 C.F.R. 1502.13 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

40 C.F.R. 1502.14 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

40 C.F.R. 1502.16 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

40 C.F.R. 1508.7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

40 C.F.R. 1508.25(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Fed. R. Civ. P. 56(c)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

1    Pursuant to Federal Rule of Civil Procedure 56, plaintiffs, by and through their

2    undersigned attorneys, hereby move the Court for summary judgment.

3                                    **INTRODUCTION**

4    This is a civil action for declaratory and injunctive relief under the Administrative

5    Procedures Act (APA), 5 U.S.C. 551-706.  Plaintiffs allege that the defendants, Six Rivers Forest

6    Supervisor Tyrone Kelley and the United States Forest Service (USFS or "Defendants"), violated

7    federal law in their approval and implementation of the Orleans Community Fuels Reduction and

8    Forest Health Project (OCFR), proposed on the Orleans Ranger District on the Six Rivers

9    National Forest in northern California.  Specifically, plaintiffs allege USFS violated the National

10   Historic Preservation Act (NHPA), 16 U.S.C. 470 et seq.; and the National Environmental Policy

11   Act (NEPA), 42 U.S.C. 4321-4370(d).[1]

12   Plaintiffs challenge USFS' failure to consult with the State Historic Preservation Officer

13   (SHPO) regarding the OCFR project as required by the NHPA.  Plaintiffs also challenge USFS'

14   failure to adequately conduct environmental review as required by NEPA, and argue that a

15   supplemental EIS is therefore required under NEPA.  USFS' actions have adversely impacted

16   cultural sites which were historically and are currently used by the Tribe for sacred ceremonies.

17   Plaintiffs are also concerned that the project, as implemented to date, increases the risk of

18   wildfire to the community of Orleans, California, and frustrate the project's goal of promoting

19   the use of appropriate prescribed fire for cultural and ecological purposes.

20   Plaintiffs seek an order declaring that the defendants have failed to comply with the

21   NHPA and NEPA, enjoining the project unless and until defendants comply with the law.

22   _____

23   [1]   Plaintiffs' Complaint also included two claims under the Healthy Forests Restoration
     Act (HFRA), 16 U.S.C. 6512(b) (Claims V and VI).  After review of the record, however, the
24   plaintiffs elect to withdraw these claims.

PAGE 1 - PLAINTIFFS'  MEM. IN SUPP. OF MO. FOR SUMM. JMT - CV-10-2039 WHA

1    **I.    FACTUAL BACKGROUND**

2        **A.    The Parties**

3        Plaintiff Karuk Tribe is a federally recognized Indian tribe.  Dkt 17, Answer ¶ 10.  The

4    other plaintiffs are non-profit environmental groups, and as explained in detail *infra* at 11 and in

5    the Declarations of Hillman, Tripp,  Baker, Greacen, and Sexton (Dkt Nos. 26-30), each of the

6    plaintiff groups has standing to bring this action.

7        Kelley is the Forest Supervisor for the Six Rivers National Forest.  Answer ¶ 14. the U.S.

8    Forest Service is a federal agency within the U.S. Department of Agriculture.  Answer ¶ 15.

9        **B.    The Project**

10        In October 2006 the USFS proposed the "Orleans Community Fuels Reduction and

11    Healthy Forest Project" ("OCFR"), prepared under the provisions of the Healthy Forest

12    Restoration Act (HFRA), 16 U.S.C. 6512(b).  Answer ¶¶ 16, 17.  The OCFR Project is a "major

13    federal action that may significantly affect the environment."  Answer ¶ 146.

14        The project area encompasses 2,698 acres in the vicinity of the town of Orleans,

15    California.  Answer ¶ 22.  The project includes commercial harvesting, and would yield about

16    seven million board feet of timber volume.  Answer ¶¶ 31, 40.  In addition, the entire treatment

17    area would be "underburned" with the exception of Unit 230.  Answer ¶ 40.  Project activities

18    could continue for as long as ten years.  Tab 141, AR 676, 679.

19        **C.    The NHPA and the Panamniik World Renewal Ceremony District**

20        Most of the OCFR Project area is within the Panamniik World Renewal Ceremony

21    District.  Tab 205, AR 1687.  These areas are sacred and of important cultural significance to the

22    Karuk Tribe.  Answer ¶ 18.  The Ceremonial District, which includes spiritual resources and

23    uses, was nominated for listing on the National Register of Historic Places in 1978 and is eligible

24    for listing under the National Historic Preservation Act (NHPA).  Answer ¶¶ 21, 112.

1    The OCFR project is a federal "undertaking" pursuant to the NHPA.  Answer ¶ 111.

2    In March 2006, the USFS "Interdisciplinary Team" (IDT) preparing the NEPA

3    documentation for the OCFR project stated:

> Because there is no MOU [Memorandum of Agreement] in place for management of the
> "district," it will be critical to have tribal support documented for the project record.
> [Note: both Hazel and Wilder fire rehab project are also in the Panamnik district and
> were implemented without an MOU.]  There are also many historic and prehistoric sites
> known to occur in the project area that will need some type of protection.

7    Tab 205, AR 1687.

8    Before the project was finalized, USFS assured the tribe and the public that "After

9    consultation with Karuk spiritual practitioners, it was determined that a Karuk spiritual trail,

10   Medicine Man Trail, will not be negatively impacted by either alternative."  Tab 269, AR 2072.

11   Since 1978, USFS has identified new sites, uses, information, and impacts in the vicinity

12   of the OCFR Project area, but has not updated the eligibility of the Panamniik World Renewal

13   Ceremony District.  Answer ¶ 118.

14   One of the more dynamic ways in which the Karuk have influenced and managed the

15   landscape within the OCFR project area is through the use of fire.  The tribe prepares spiritual

16   fires throughout the Ceremonial District on an annual basis.  There are many tan oak stands

17   throughout the project in conditions appropriate for cultural burning under tribal prescriptions

18   for this particular species, and USFS assured the tribe that the OCFR project "will help to restore

19   conditions that support cultural burning."  Tab 269, AR 2072.

20   **D.      The Environment Affected by the Project**

21   The project area surrounds the rural Klamath River town of Orleans.  The project area

22   contains habitat for the Northern spotted owl, bald eagle, and osprey, and contains the endemic

23   Orleans iris.  Answer ¶ 22.  The steep, rugged watersheds flow into the Klamath River, which

24   once harbored some of the most productive salmon runs on the Pacific Coast.  Id.  Past

PAGE 3 - PLAINTIFFS'  MEM. IN SUPP. OF MO. FOR SUMM. JMT - CV-10-2039 WHA

1   harvesting practices and fire suppression in the OCFR project area have removed many of the

2   large, fire-resistant trees from the landscape, while allowing dense stands of fire-prone young

3   conifers to become established.  However, there are still stands of old growth remaining, and

4   dominant, centuries-old trees are scattered throughout the landscape.

5           **E.      The Collaborative Partnership**

6           From initial project scoping, the USFS pursued meetings with the plaintiffs and others in

7   the project area as a "Collaborative Partnership," in an effort to develop a collaborative "action

8   alternative" for the project.[2]  Answer ¶¶ 5, 23.  As part of the Partnership, plaintiffs provided

9   continuous input into the OCFR project planning process, through comments, meetings and

10  fieldwork.  Answer ¶ 24.  Over the course of over two years, the Partnership met with the USFS

11  many times to discuss and outline the scope of the project, protection of environmental and

12  cultural resources, and project implementation, which was to include, among other things,

13  collaborative monitoring with Partnership participation.  Answer ¶ 23.  USFS assured the

14  Partnership that the agency supported "multi-party monitoring" of the implementation of the

15  project, and that "[t]he prioritization of the units will happen before the project goes out to

16  contract.  The contracting officer will convene the collaborative group to discuss priorities.  This

17  will be in FY 2009."  Tab 345, AR 4235; Tab 95, AR 475 (monitoring).

18          In addition to the HFRA collaboration, USFS acknowledged early in the project planning

19  that ongoing government-to-government collaboration with the Karuk tribe was crucial, to avoid

20  the types of impacts to tribal cultural resources which had occurred in the past.  For example, at a

21  January 2008 collaborative meeting, it was noted that "Marking, sales administration and

22

23          [2]  Consistent with the Congressional purpose of the HFRA "to reduce wildfire risk to
    communities, municipal water supplies, and other at-risk Federal land through a collaborative
    process of planning, prioritizing, and implementing hazardous fuel reduction projects," USFS

24  must use a collaborative planning process with the interested public.  16 U.S.C. 6514(f).

PAGE 4 - PLAINTIFFS'  MEM. IN SUPP. OF MO. FOR SUMM. JMT - CV-10-2039 WHA

1  designation of skid trails and landings will require oversight from the Karuk Tribe and

2  collaborative group.  Past experience tells us that the sales administrator will make on-the-

3  ground decisions that will negatively impact collaborative decisions.  Oversight is required."

4  Tab 333, AR 4213.  See also Tab 791, AR 5797 ("the Tribe and the community" have "great

5  concern in how this project will be implemented.").

6         **F.     The Draft EIS and Plaintiffs' Comments**

7         In March 2008, USFS issued a Draft Environmental Impact Statement (DEIS) for the

8  OCFR project, starting a 60-day period for review and public comment.  Answer ¶ 26.  The

9  plaintiffs and others commented on the DEIS.  Answer ¶ 10, 30.  Although commenters

10  supported the stated purposes of the project, they did not support the project's focus on

11  commercial logging (including substantial logging of large, fire-resistant trees and areas remote

12  from the human community), noting that because of that focus, the proposed project actually

13  risked increasing the risk of fire to the community, and risked harming cultural and

14  environmental resources.  For example, a past Forest Service employee commented:  "By cutting

15  and disturbing old forests, you have to open up habitat for denser vegetation, thus having larger

16  fires.  Some areas should have treatment, but no trees over 24 inch dbh should be harvested for

17  fuels reduction."  Tab 49, AR 359.

18         Tribal chairman Arch Super noted that "the potential for irreparable damage to these sites

19  and resources is extremely high without an established partnership in planning and

20  implementation under stewardship authorities" and "[i]rreparable damage to these sites and/or

21  resources has historically occurred on every project undertaken by the Forest Service in this

22  area."  Tab 285, AR 2485, 2486.  He noted, for example, that past attempts by USFS to protect

23  cultural resources by flagging known sites had "historically failed."  Tab 285, AR 2494.

24         Super noted that there were already concerns about the OCFR project, because, for

PAGE 5 - PLAINTIFFS'  MEM. IN SUPP. OF MO. FOR SUMM. JMT - CV-10-2039 WHA

1    example, "specialist reports have not been made available until April 30, 2008, which only

2    allows 13 days of effective comment period which is impossible for the Tribe."  Tab 285, AR

3    2492.

4        **G.    The Final EIS, Objection/Resolution Process, and Record of Decision (ROD)**

5            In June 2008, the USFS issued the Final Environmental Impact Statement (FEIS) for the

6    OCFR project.  Answer ¶ 32.  The FEIS purported to remedy all issues raised in public

7    comment, and proposed an action alternative that would treat about 2700 acres of forest lands by

8    thinning and/or pruning, hand piling and burning, jackpot burning, yarding tops, and/or

9    understory burning.  The project designated many treatment areas as hand units -- areas where

10   fuels reduction thinning work is to be conducted without the use of heavy equipment.  The

11   proposed alternative did, however, retain the commercial logging components proposed in the

12   DEIS.

13           In July 2008, the plaintiff members of the Partnership, as well as the Orleans/Somes Bar

14   Fire Safe Council and the Mid-Klamath Watershed Council, filed an "Objection" to the FEIS

15   with USFS, pursuant to HFRA.  Answer ¶¶ 10, 35, 168; Tab 132, AR 622.  The Objection

16   detailed issues concerning (1) retention of tree canopy, particularly necessary for protected

17   wildlife species listed or proposed for listing under the Federal Endangered Species Act, such as

18   the Northern spotted owl, bald eagle, and Pacific fisher; (2) removal of large diameter trees as

19   inconsistent with the project purpose; (3) the roles and responsibilities of the parties to the

20   collaborative Partnership; (4) the need for project effectiveness and validation monitoring; and

21   (5) the significant impacts of the project on the Ceremonial District.  Tab 132, AR 622-633.

22           In August 2008, the Partnership participated in a site visit and meeting with USFS, and

23   reached a Resolution Agreement.  Answer ¶¶ 37, 38, 168.  The USFS agreed to (Tab 599, AR

24   5006-5009):

PAGE 6 - PLAINTIFFS'  MEM. IN SUPP. OF MO. FOR SUMM. JMT - CV-10-2039 WHA

(1) drop late-successional unit 146;

(2) seek additional hardwood release treatment opportunities with the Partnership's consent;

(3) grant the Partnership access to project files, budgets, GIS information and maps;

(4) explore options for a future stewardship plan;

(5) discuss opportunities for stewardship implementation;

(6) allow the Partnership to provide input on project treatment sequence;

(7) notify and meet with the Partnership to discuss environmental concerns during implementation;

(8) address any environmental concerns about cultural issues during implementation with the Karuk Tribe on a government-to-government basis;

(9) notify the Partnership of any survey results for wildlife; and

(10) establish a collaborative multi-party monitoring plan.

During discussions with the tribe, USFS agreed that hand units in sensitive areas would be treated by tribal crews with a Karuk Priest present to avoid and minimize potential impacts to the cultural areas.  USFS also agreed that plaintiffs would be provided an opportunity for substantive review of the OCFR contract prior to it being offered.  Tab 70, AR 421.  USFS also agreed to provide implementation maps to plaintiffs.  See Answer ¶ 52.

Forest Supervisor Kelley signed the OCFR Record of Decision (ROD) in August 2008.  Answer ¶ 39.  The ROD implements Alternative 2 "as modified during the resolution process," authorizing implementation of the proposed action as described in the FEIS, and eliminating commercial harvest in unit 146.  Tab 142, AR 944.

**H.    Defendants' "Programmatic Agreement" with the SHPO**

The Pacific Southwest Region of the USFS, the California State Historic Preservation Officer (SHPO), and the Advisory Council on Historic Preservation (ACHP) entered into a "First

1    Amended Regional Programmatic Agreement" ("Programmatic Agreement" or "PA") in 2001.

2    Answer ¶ 41, Tab 744, AR 5489.

3        Throughout the OCFR review and approval process, rather than consulting according to

4    the requirements of Section 106 of the NHPA (a process discussed *infra* at 12-13), USFS relied

5    solely on this PA for NHPA compliance.  Tab 717, AR 5394.

6        The PA does not cover the extent of potential impacts from the OCFR project or the

7    project as implemented.  Tab 717, AR 5394.  Although the PA in some circumstances allows the

8    USFS to avoid site-specific NHPA consultation, it covers only archaeological resources, and not

9    spiritual or cultural resources and the current tribal uses of the Ceremonial District.  Id.

10       For the resources it does cover, the PA contains specific "Standard Resource Protection

11   Measures," which must be met when the USFS is aware a project may impact sites known to be

12   eligible under the NHPA.  Tab 744, 5514-19.  USFS did not comply with the Standard Resource

13   Protection Measures for known sites.  Tab 717, AR 5394.

14       **I.        Implementation of the Project**

15       Commercial logging under the OCFR project began in late 2009.  Answer ¶ 47.  At the

16   time USFS filed its answer, logging was expected to continue throughout 2010 (Answer ¶ 47),

17   but to plaintiffs' knowledge the current status is that only three out of more than 100 units have

18   been logged.  To plaintiffs' knowledge the remainder of the project could, however, proceed at

19   any time.

20       USFS refused to provide plaintiffs with a copy of the contract until operations were well

21   underway and did not provide sale maps, even though USFS did map the trees to be logged that

22   were over 24 inches in diameter (dbh).  Tab 511, AR 4852; Answer ¶ 52.

23       During logging of the initial units, heavy equipment was used in hand units and was

24   parked on a Spiritual Trail used by the Karuk Medicine Man during Panamniik World Renewal

PAGE 8 - PLAINTIFFS'  MEM. IN SUPP. OF MO. FOR SUMM. JMT - CV-10-2039 WHA

1   ceremonies within the Ceremonial District.  Answer ¶¶ 60, 62, 66.  Trees were cut in hand units

2   near the Spiritual Trail without tribal involvement.  Answer ¶ 61.  The contractor used heavy

3   equipment to create log decks of hardwood trees generated in the course of harvesting.  Answer

4   ¶ 63.  These log decks were directly along the Spiritual Trail.  Tab 728, AR 5423.  USFS has

5   allowed the contractor to cut guy-line trees along the Spiritual Trail in the hand unit, in violation

6   of the Resolution Agreement and directly impacting the Tribe's spiritual and cultural use of the

7   Trail.  Tab 212, AR 1705; Tab 283, AR 2473; Tab 437, AR 4562; Tab 476, AR 4783-84; Tab

8   723, AR 5408.

9        The contractor also used a road for operations in wet weather conditions (Answer ¶

10  79(g)), in violation of the OCFR Design Features and Applicable Standards and Guides Listing.

11  Tab 742, AR 5482.

12       The contractor also cut undesignated trees, in violation of the contract.  Tab 422, AR

13  4543.  One USFS staffer noted that "[t]he units have morphed and changed so much that the

14  maps on the back of the cards are not very good.  The unit boundaries seemed to be different on

15  the new map then the stand record cards show them currently to be."  Tab 605, AR 5035.

16       Pursuant to Resolution provision 3.G (Tab 599, AR 5008), in December 2009, plaintiffs

17  notified the USFS of their concerns about project implementation and impacts, and requested

18  that the USFS take action to halt mechanical implementation and resolve the concerns.  Answer

19  ¶ 80, Tab 723, AR 5406.  USFS suspended the contract in December 2009 and initially worked

20  with the Tribe and the collaborative partnership to try to resolve the issues, holding meetings

21  related to concerns about the OCFR Project.   Answer ¶¶ 81, 82.  Plaintiffs sent letters to the

22  USFS in February and April 2010, clarifying and restating their concerns.  Answer ¶¶ 83, 88,

23  Tab 660, AR 5201; Tab 703, AR 5349.  In late March 2010, the plaintiffs met informally with

24  the USFS to try and resolve these concerns.  Answer ¶ 84.

PAGE 9 - PLAINTIFFS'  MEM. IN SUPP. OF MO. FOR SUMM. JMT - CV-10-2039 WHA

1    On April 3, 2010, plaintiffs sent a letter to USFS, requesting rescission of the ROD, or in

2    the alternative to suspend the project activities in order for the Partnership to pursue resolution of

3    the concerns through the collaborative process.  Tab 703, AR 5349.  No response was received

4    (Answer ¶ 89), and this lawsuit ensued.

5    **II.    STANDARD FOR SUMMARY JUDGMENT**

6    The Court should grant summary judgment if there are no genuine issues of material fact

7    and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The

8    substantive law governing a claim or defense determines whether a fact is material.  T.W. Elec.

9    Serv., Inc. v. Pacific Elec. Contractors Ass'n., 809 F.2d 626, 630 (9th Cir. 1987).  The Court

10   must view the facts in the light most favorable to the non-moving party.  Oliver v. Keller, 289

11   F.3d 623, 626 (9th Cir. 2002).

12   Under the Administrative Procedures Act, this Court must reject agency action that is not

13   in accordance with law, or is without observance of procedures required by law, or is "arbitrary

14   and capricious."  5 U.S.C. 706.  Although the "arbitrary and capricious" standard of review

15   applied in APA cases is deferential, the agency must "articulate a satisfactory explanation for its

16   action including a 'rational connection between the facts found and the choice made,'" and this

17   Court must "consider whether the decision was based on a consideration of the relevant factors

18   and whether there has been a clear error of judgment."  Motor Vehicle Mfrs. Ass'n of U.S., Inc.

19   v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S. Ct. 2856, 2866-67 (1983) (citations

20   omitted).  "Agency deference has not come so far that we will uphold regulations whenever it is

21   possible to 'conceive a basis' for administrative action."  Bowen v. American Hosp. Ass'n, 476

22   U.S. 610, 626, 106 S. Ct. 2101, 2112 (1986).  Reviewing courts must not merely "rubber-stamp

23   administrative decisions."  Ocean Advocates v. U.S. Army Corps of Engineers, 361 F.3d 1108,

24   1119 (9th Cir. 2004).  Under the Administrative Procedures Act, the Court is to consider whether

PAGE 10 - PLAINTIFFS'  MEM. IN SUPP. OF MO. FOR SUMM. JMT - CV-10-2039 WHA

1    the USFS's decision "was based on a consideration of the relevant factors and whether there has

2    been a clear error of judgment." <u>Idaho Sporting Congress v. Thomas</u>, 137 F.3d 1146, 1149 (9th

3    Cir. 1998).

4                                    **ARGUMENT**

5           Defendants violated the National Historic Preservation Act (NHPA) and the National

6    Environmental Policy Act (NEPA).  Ongoing project implementation risks harm to significant

7    cultural and environmental resources and a permanent injunction is therefore warranted, pending

8    defendants' compliance with these laws.

9    **I.     PLAINTIFFS HAVE STANDING**

10          As demonstrated in the Declarations of Hillman, Tripp,  Baker, Greacen, and Sexton (Dkt

11   Nos. 26-30), each of the plaintiff groups has standing to bring this action.  <u>See</u> <u>Pit River Tribe v.</u>

12   <u>U.S. Forest Service</u>, 469 F.3d 768, 779 (9th Cir. 2006) ("representational standing" regarding

13   members; "Once a plaintiff has established an injury in fact under NEPA, the causation and

14   redressability requirements are relaxed. . . . "[T]he members must show only that they have a

15   procedural right that, if exercised, <u>could</u> protect their concrete interests"); <u>Hunt v. Washington</u>

16   <u>State Apple Advertising Comm'n</u>, 432 U.S. 335, 343 (1977) ("organizational standing").[3]

17   **II.    THE OCFR PROJECT VIOLATES THE NATIONAL HISTORIC
            PRESERVATION ACT**

18

19        **A.     The Provisions of the NHPA**

20              **1.     The NHPA applies to the OCFR project**

21          The OCFR project is a federal "undertaking" subject to the National Historic Preservation

22   Act (NHPA), 16 U.S.C. 470-470W-6 9 (enacted 1966).  Answer ¶ 111; 36 C.F.R. 800.16(y).

23          [3] "[T]he presence of one party with standing is sufficient to satisfy Article III's
     case-or-controversy requirement."  <u>Rumsfeld v. Forum for Academic and Institutional Rights,</u>

24   <u>Inc.</u>, 547 U.S. 47 n.2, 126 S. Ct. 1297 (2006).

1          **2.        The general requirements of the NHPA**

2          Under NHPA Section 106, a federal agency having jurisdiction over a proposed

3  "undertaking" must, <u>prior to approval</u> of the project, "take into account the effect of the

4  undertaking on any district, site, building structure or object that is included in or <u>eligible</u> for

5  inclusion in the National Register."  16 U.S.C. 470f (emph. added).  <u>See also</u> 36 C.F.R. 800.1,

6  800.16(l); <u>Hoonah Indian Ass'n v. Morrison</u>, 170 F.3d 1223, 1230 (9th Cir. 1999).  Section 106

7  is a "stop, look, and listen" provision that requires each federal agency to consider the effects of

8  its programs.  <u>Apache Survival Coalition v. United States</u>, 21 F.3d 895, 906 (9th Cir. 1994).

9          Under the NHPA, a federal agency must:

10          - make a reasonable, good faith effort to identify historic properties, 36 C.F.R. 800.4(b);

11          - determine whether identified properties are eligible for listing on the National Register;

12          - reevaluate historic properties if a prior evaluation is incomplete.  36 C.F.R. 800.4( c)(1);

13          - assess the effects of the undertaking on any eligible historic properties found, 36 C.F.R.
            800.4(c), 800.5, 800.9(a);

14

15          - determine whether the effect will be adverse, 36 C.F.R. 800.5(c), 800.9(b); and

            - <u>avoid or mitigate any adverse effects</u>, 36 C.F.R. 800.8(e), 800.9(c).
16

17  16 U.S.C. 470 *et seq*.; 36 C.F.R. 800.4 - .9.  The agency official must involve all of the

    "consulting parties" in "all findings and determinations made during the Section 106 process."
18

19  36 C.F.R. 800.2(a)(4).  The "consulting parties" for projects must include the State Historic

    Preservation Officer (SHPO) and "any Indian tribe that attaches religious and cultural
20

21  significance to historic properties that may be affected by an undertaking."  36 C.F.R.

    800.2(c)(1), 800.2(c)(2)(ii).
22

23          If a project in fact ends up having an adverse effect, the agency <u>must</u> document that and

24  must consult <u>further</u>, to develop and evaluate alternatives or modifications that could avoid,

1    minimize, or mitigate further adverse effects.  36 C.F.R. 800.5 -.11.

2        An NHPA determination or finding must be "supported by sufficient documentation to

3    enable any reviewing parties to understand its basis."  36 C.F.R. 800.11(a).

4        Agencies must "ensure that the undertaking is carried out in accordance with [any]

5    memorandum of agreement" in place under the NHPA.  36 C.F.R. 800.6 (c).

6           **3.      NHPA requirements regarding Indian tribes**

7        Additional NHPA provisions apply to Indian tribes.  Federal agencies must "make a

8    reasonable and good faith effort to identify any Indian tribes . . .  that might attach religious and

9    cultural significance to historic properties in the area of potential effects and invite them to be

10   consulting parties."  36 C.F.R. 800.3(f)(2).

11           (A) Properties of traditional religious and cultural importance to an Indian tribe . . . may
             be determined to be eligible for inclusion in the National Register.

12

13           (B) In carrying out its responsibilities under Section 106, a Federal Agency <u>shall consult
             with any Indian Tribe</u> . . . that attaches religious and cultural significance to properties
             described in Subparagraph (A).

14

15   16 U.S.C. 470a(d)(6) (emph. added).  <u>See also</u> 36 C.F.R. 800.2(c)(1), (2)(ii), 800.16(l).

16       The agency official must involve all of the "consulting parties" in "all findings and

17   determinations made during the Section 106 process."  36 C.F.R. 800.2(a)(4).  Agencies must

18   initially gather information from any Indian tribe to assist in identifying properties, including

19   those located off tribal lands, which may be of religious and cultural significance to them and

20   may be eligible for the National Register.  36 C.F.R. 800.4(a)(3).  The federal agency must

21   <u>continue</u> to consult the Tribe(s) at each stage of the Section 106 process:

22           The agency official shall ensure that consultation in the section 106 process provides the
             Indian tribe . . .  a reasonable opportunity to identify its concerns about historic
             properties, advise on the identification and evaluation of historic properties, including
23           those of traditional religious and cultural importance, articulate its views on the
             undertaking's effects on such properties, and participate in the resolution of adverse
24           effects.

PAGE 13 - PLAINTIFFS'  MEM. IN SUPP. OF MO. FOR SUMM. JMT - CV-10-2039 WHA

1    36 C.F.R. 800.2(c)(2)(ii)(A).

2    **B.    Defendants Violated the NHPA**

3         It is undisputed that the Ceremonial District is "eligible" for listing under the NHPA.

4    Answer ¶ 112.  It is also undisputed that the government has not updated that eligibility nor

5    reviewed the other Karuk tribal sacred sites.  Answer ¶ 118.

6         USFS has acknowledged that the OCFR project has already affected and may continue to

7    affect the Ceremonial District, Cultural Areas and the Karuk Tribe's spiritual, religious, cultural,

8    and historical uses of the District, in the absence of consultation.  See, e.g., Tab 630, AR 5108

9    ("There were key elements of planning that were not followed through in the decision

10   documents.  This resulted in implementation problems that eventually led to impacts to eligible

11   property."); Tab 735, AR 5464 (Regional Forester acknowledges to SHPO there were "failures

12   that resulted in adverse effects" to the Ceremonial District during implementation of the OCFR).

13   See also Tab 630, AR 5108; Tab 662, AR 5207.

14        After these problems with implementation came to light, the SHP O stated:

15        I am proposing a program review which the FS would conduct with participation of my
          staff to determine if the failures which have resulted in adverse effects to the Panamnik
16        World Renewal Ceremonial District were a result of a failure to communicate the
          conditions for protecting historic properties during the implementation of the undertaking
17        or as a result of a 'clear pattern of consistent and broad failure to meet stipulations'
          (Stipulation IX.B2(c) of the regional PA).
18
     Tab 662, AR 5207.
19
          **1.    Defendants failed to consult with the SHPO regarding the project**
20
          Instead of initiating consultation with the California State Historic Preservation Office
21
     (SHPO) or the Advisory Council under NHPA section 106 (per 36 C.F.R. Part 800) for the
22
     review of the OCFR project as project and as implemented, the USFS relied solely on the
23
     Programmatic Agreement (PA) for the Six Rivers National Forest.
24

PAGE 14 - PLAINTIFFS'  MEM. IN SUPP. OF MO. FOR SUMM. JMT - CV-10-2039 WHA

1     The PA covers only archeological resources, but the Ceremonial District includes

2   spiritual resources and other uses not covered by this Programmatic Agreement, and therefore

3   the PA is inadequate to cover the extent of potential impacts from the project.  The SHPO agreed

4   with the plaintiffs on this point in May 2010 when the SHPO did a program review.  Tab 717,

5   AR 5394.  The USFS summary of "Findings from Program Review with SHPO" states:

6   "Findings and Recommendations: 1.) There was a fatal flaw in the Programmatic Agreement

7   (not just Six Rivers, but all Forests): use of PA approach isn't appropriate where Traditional

8   Cultural Properties are involved.  The SHPO will be notifying the Regional Forester who will

9   provide new direction to Forests."  Id.

10     USFS was aware of the OCFR project's impacts to the Ceremonial District and cultural

11   areas, but never initiated consultation with the SHPO or ACHP during project review, approval

12   or implementation.  In addition to violating the consultation requirement in 36 C.F.R. 800.2,

13   USFS failed to support any NHPA findings it did make "by sufficient documentation to enable

14   any reviewing parties to understand its basis"  36 C.F.R. 800.11(a).

15           **2.      Defendants did not evaluate and mitigate the impacts to the eligible
                       areas**

16

17     In May 2010, the Forest Service acknowledged its errors internally, in the context of the

18   SHPO's "findings and recommendations":  "There are a number of findings/recommendations

19   specific to OCFR project, but the just [sic] of it is:  our undertaking did result in adverse effects

20   to TCPs ["traditional cultural properties"]/Historical Properties, and we failed to implement

21   standard protection measures identified in the NEPA analysis.  This is important to other districts

22   to consider, since we do seem to have a procedural problems connecting NEPA, contracting and

23   project implementation."  Tab 717, AR 5394.

24     As discussed *supra* at 8-9, the project as implemented clearly adversely affected the

PAGE 15 - PLAINTIFFS'  MEM. IN SUPP. OF MO. FOR SUMM. JMT - CV-10-2039 WHA

1    physical integrity of the Spiritual Trail and the other areas associated with the Ceremonial

2    District, but defendant has not taken steps to mitigate that harm, thereby violating 36 C.F.R.

3    800.5 through 800.11.

4         For example, the contractor used heavy equipment to create log decks of hardwood trees

5    generated in the course of harvesting (Answer ¶ 63), which were directly along the Spiritual

6    Trail, but tribal requests to move the log decks impacting the ceremonial trail were ignored.  Tab

7    728, AR 5423.  In general the tribe's concerns have been dismissed out of hand and to plaintiffs'

8    knowledge, the contract has not been modified nor other mitigation measures taken to date.

9         Furthermore, the USFS archaeologist acknowledged that the project should never have

10   gone forward without consultation and evaluation of the impacts, and sensitive archaeological

11   sites had not been documented prior to the contract being let.  Tab 721, AR 5403 ("we shouldn't

12   have approved a NEPA document without completion of the cultural resources work (including

13   the reports), and certainly shouldn't be implementing the project"); Tab 471, AR 4776**.**

14        Other USFS staff acknowledged just after the contract had been awarded, that the agreed

15   mitigations had not been included in the contract.  Tab 476, AR 4783 ("the FS may be guilty of

16   not getting agreed upon mitigations (with the Tribe) into the contract"); id. at 4784 (guy tree

17   provision missing from contract); Tab 479, AR 4788 ("these partially planned mitigations (some

18   made it into standards), did not get documented into the Final NEPA doc's nor the Service

19   Contract."); Tab 494, AR 4810 ("The first I heard about the intent of having a yoader yard

20   material out of unit 1 and 2 was on Thursday, 1 day prior to start operations.  In reading the

21   contract there was no mention of this nor was it mentioned in the EIS.  I also received Cultural

22   maps with all cultural sites to protect and this area including the trail was not listed."); Tab 495,

23   AR 4812-13 ("we have run into the issue below with the Forest not following things all the way

24   through from NEPA."); Tab 497, AR 4819 ("if I could go back in time I would, and put the

PAGE 16 - PLAINTIFFS'  MEM. IN SUPP. OF MO. FOR SUMM. JMT - CV-10-2039 WHA

necessary mitigations that were agreed upon with USFS partners into NEPA doc's so that they would have made their way into the contract language which would make all our jobs easier."); Tab 590, AR 4986 ("shows that the FS did not review their own contract before it went out."); Tab 595, AR 5000 (several units located in cultural traditional tan oak acorn and mushroom areas; "There is no mention of the values or how to protect those values on the green cards.").

### 3. Defendants never updated the record regarding eligibility

USFS also failed to update the record relating to the eligibility of the Ceremonial District. Answer ¶ 118. This is despite the fact there have been many new sites, uses, information, and/or impacts identified within and adjacent to the Area of Potential Effects for the OCFR project since the original determination of eligibility in 1978. Answer ¶ 118; Tab 471, AR 4776. USFS thereby violated the NHPA requirement that agencies reevaluate historic properties if a prior evaluation is incomplete. 36 C.F.R. 800.4(c)(1).

### 4. Defendant did not even follow the provisions of the Programmatic Agreement

The Programmatic Agreement (PA) contains "Standard Resource Protection Measures" which must be followed for known eligible sites. Tab 744, 5514-19. USFS did not follow the Standard Resource Protection Measures with regards to the Cultural District. Tab 717, AR 5394. USFS therefore violated the NHPA requirement that it "ensure that the undertaking is carried out in accordance with [any] memorandum of agreement" in place under the NHPA. 36 C.F.R. 800.6(c).

## III.   THE OCFR PROJECT VIOLATES NEPA

The OCFR project is a major federal action which may significantly affect the environment, and it therefore requires an EIS under NEPA. Answer ¶ 146; 42 U.S.C. 4332(2)(c). An EIS must contain a detailed discussion of environmental impacts of the project

1    (40 C.F.R. 1502.16) and alternatives (40 C.F.R. 1502.14).

2        As detailed in this brief, the project as implemented is different from how it was

3    described in the FEIS, and the FEIS did not adequately disclose the impacts from the project.

4    Furthermore, the project fails to meet its stated purposes and needs.  For these reasons, the

5    project violates NEPA.

6        **A.    Defendant Failed to Prepare a Supplemental EIS (SEIS)**

7            **1.    NEPA requires an SEIS when new information regarding impacts
                     comes to light**

8

9    NEPA requires a federal agency to prepare a supplemental EIS when "[t]here are

10   significant new circumstances or information relevant to environmental concerns and bearing on

     the proposed action or its impacts."  40 C.F.R. 1502.9(c)(1)(ii).  See Marsh v. Oregon Natural

11   Resources Council, 490 U.S. 360, 374, 109 S. Ct. 1851 (1989) ("NEPA does require that

12   agencies take a 'hard look' at the environmental effects of their planned action, even after a

13   proposal has received initial approval.").

14           **2.    The project implementation is outside the scope of analysis and
                     record of decision**

15

16       The project implemented by the USFS is not within the scope of the OCFR project that

17   was reviewed in the FEIS, the subject of the Objection and Resolution of Objection agreed to by

18   the plaintiffs, or the OCFR project approved by the ROD.

19       The skyline corridors in the project as implemented are approximately 20 to 30 feet wide

20   on average, far in excess of the OCFR project as evaluated and approved, and double to triple the

21   ten-foot width limit identified in the FEIS.  Tab 723, AR 5406.

22       The clearings which have been and will be created for the yarder in the project as

23   implemented are larger than were evaluated and approved for the OCFR project; landings were

24   analyzed to be 0.25-0.5 acres in size for skyline and ground based activities instead of "most"

1    being less than 0.25 acre as had been predicted.  Tab 103, AR 488; Tab 370, AR 4313, 4316.

2         The OCFR project required that hardwoods be retained and protected from "incidental"

3    injury, in part by directional felling of conifers, and that prior incentives to the contractors to

4    remove hardwoods be minimized in the project.  Tab 267, AR 1959-60; Tab 742, AR 5479

5    (directional felling); Tab 755, AR 5656 ("Making a profit off the hardwood could encourage the

6    unnecessary removal of hardwoods").  But in implementation the USFS allowed many mature

7    hardwood trees to be removed where directional felling should have avoided those losses.  Tab

8    425, AR 4547; Tab 383, AR 4482 (Contract Hardwood Agreement); Tab 560, AR 4943-44; Tab

9    670, AR 5224 (contractor wants "enough" hardwoods for "his crew"; unknown quantity of add-

10   on volume approved); Tab 672, AR 5226-27; Tab 723, AR 5407 (appears to have been little

11   effort to do directional felling); Tab 728, AR 5423.

12        Contrary to the approved OCFR project, the road has been used for logging activity in

13   wet weather conditions, causing impacts which were not within the scope of analysis of the FEIS

14   and the ROD and violating the OCFR Design Features and Applicable Standards and Guides

15   Listing.  Tab 742, AR 5482; Answer ¶ 79(g).

16        The contractor also left large unmerchantable material ("YUM") on the ground, violating

17   the OCFR Design Features and Standards and contributing to surface fuel density.  Tab 421, AR

18   4542; Tab 577, AR 4968 ("Leaving this material in the woods increases fuel loading, which goes

19   against the intent of the OCFR and Forest Health project."); Tab 742, AR 5479 (Design Features

20   and Standards); Tab 728, AR 5423.

21        During logging of the initial units, heavy equipment was used in hand units and was

22   parked on a Spiritual Trail used by the Karuk Medicine Man during Panamniik World Renewal

23   ceremonies within the Ceremonial District.  Answer ¶¶ 60, 62, 66.  Trees were cut in hand units

24   near the Spiritual Trail.  Answer ¶ 61.

PAGE 19 - PLAINTIFFS' MEM. IN SUPP. OF MO. FOR SUMM. JMT - CV-10-2039 WHA

1        The contractor used heavy equipment to create log decks of hardwood trees generated in

2    the course of harvesting.  Answer ¶ 63.  These log decks were directly along the Spiritual Trail,

3    and tribal requests to move the log decks impacting the ceremonial trail were ignored.  Tab 728,

4    AR 5423.

5        The project as implemented has cut, and the USFS has stated that it plans to continue to

6    cut, guy-line trees along the Spiritual Trail in the hand unit, directly impacting the Tribe's

7    spiritual and cultural use of the Trail.  Tab 212, AR 1705; Tab 283, AR 2473; Tab 437, AR

8    4562; Tab 476, AR 4783-84; Tab 723, ER 5408.

9        There was no archaeologist on site during project implementation.  Tab 728, AR 5423.

10   The FEIS promised that an archaeologist would be on site during project implementation to

11   ensure (1) cultural sites and buffer zones would be flagged and avoided; (2) flags would be

12   removed in a timely manner to reduce unwanted attention to cultural sites; and (3) potential

13   impacts to previously unidentified cultural sites would be minimized.  Tab 141, AR 925.

14       Furthermore, species surveys were not done as specified in the FEIS.  USFS stated in the

15   FEIS it would "conduct surveys to protocol" for goshawk (Tab 141, AR 768, 870); northern

16   spotted owl (AR 866, 869); and bald eagle (AR 870).  These surveys were not done, however.

17   The 2009 Wildlife Survey Report discusses NSO surveys in the Cedar and Waterman West

18   projects but does not mention OCFR.  Tab 801, AR 5817-18, 5820.  Similarly, the goshawk

19   survey discussion mentions only the Waterman West project.  Tab 801, AR 5818.  The report

20   states that "[a]dequate survey visits and times for these two species (Bald Eagle and Peregrine

21   Falcon) were not conducted to recommended protocols."  Tab 801, AR 5822.

22       In addition, as explained *infra*, because the project does not meet the stated purpose and

23   need regarding fire danger, the FEIS also failed to adequately disclose impacts from increased

24   fire danger.

PAGE 20 - PLAINTIFFS'  MEM. IN SUPP. OF MO. FOR SUMM. JMT - CV-10-2039 WHA

All of these changes from the project as described in the FEIS require USFS to prepare a Supplemental EIS.

### B.    Defendant Failed to Adequately Disclose and Analyze the Project's Environmental Impacts

NEPA requires federal agencies to analyze a project's foreseeable environmental impacts, including direct, indirect, and cumulative impacts.  42 U.S.C. 4332(2)(c); 40 C.F.R. 1508.7, 1508.25(a)(2).  As explained in this brief, the OCFR project FEIS failed to adequately analyze and disclose direct, indirect, and cumulative effects of the project to the Ceremonial District, Cultural Areas, and the spiritual, cultural, and historical values they embody.  The project as implemented clearly and undisputedly has impacted these areas and values to an extent that was not acknowledged in the EIS.

As discussed *supra* at 20, USFS failed to survey for the bald eagle, northern spotted owl, and other wildlife species.  Since USFS stated that such surveys would be done before project activities were conducted, the FEIS wildlife analysis was based on faulty assumptions and failed to disclose the true risk of impacts due to failure to survey.

### C.    The Project Fails to Meet Its Stated Purpose and Need

NEPA requires that every major federal action state the purpose(s) and need(s) which the action is intended to meet.  40 C.F.R. 1502.13.  The stated purpose for the OCFR project is to "manage forest stands to reduce hazardous fuel accumulations and improve forest health around the community of Orleans while enhancing cultural values associated with the Ceremonial District."  Tab 141, AR 667.

As implemented, the OCFR project is not within the scope of the stated purpose and need for the project.  As discussed *supra*, the project does not "enhance" the cultural values associated with the Ceremonial District, but rather, injured those values.

PAGE 21 - PLAINTIFFS' MEM. IN SUPP. OF MO. FOR SUMM. JMT - CV-10-2039 WHA

1    Nor does the project "reduce hazardous fuel accumulations" – as explained *supra* at 5 and

2    19, the contractor in fact left hazardous fuels on-site and the project <u>as designed</u> increased fire

3    hazards.

4    Other activities that have occurred during project implementation which are not

5    consistent with managing forest stands to reduce fuels accumulations and improve forest health

6    around the community of Orleans, while enhancing cultural values associated with the

7    Ceremonial District and Cultural Areas include:

8    - The skyline corridors in the project as implemented are approximately 20 to 30
     feet wide, far in excess of the OCFR project as evaluated and approved, and double to
9    triple the ten-foot width limit identified in the FEIS.

10   - The clearings which have been and will be created for the yarder in the project
     as implemented are larger than were evaluated and approved for the OCFR project;
11   landings were analyzed to be 0.25-0.5 acres in size for skyline and ground based
     activities.

12

13   - Many large trees have been logged in these expanded corridors and yarding
     areas, compromising the objectives of the OCFR project to protect overstory trees from
     wildfire, protect hardwoods and wildlife habitat, and create fire-resilient stands.

14

15   - The cutting of so many large trees in the project as implemented fails to
     maximize retention of large trees as required by the HFRA.  This is contrary to the OCFR
     project as approved because this issue was central to the substantive agreement reached
16   between the parties to resolve plaintiffs' formal objection to the project.

17   - Despite requirements in the OCFR project that hardwoods be retained and
     protected, in part by directional felling of conifers, the USFS has allowed many mature
18   hardwood trees to be removed where directional felling should have avoided those losses.
     The USFS has allowed the contractor selected for the project to sell hardwoods as
19   firewood on past local sales, creating an economic incentive for the contractor to not
     retain hardwoods.

20

21   - Contrary to the approved OCFR project, the road has been used for logging
     activity in wet weather conditions, causing impacts which were not within the scope of
     analysis of the FEIS and the ROD.

22

                                    **CONCLUSION**

23

     Based on this brief, the Administrative Record, and the standing Declarations filed

24

1  earlier, plaintiffs respectfully request that the Court grant them summary judgment, and provide

2  the following relief:

3      a)      A declaration that defendants violated the NHPA and the APA;

4      b)      A declaration that defendants failed to comply with NEPA and the APA;

5      c)      An order enjoining defendants from undertaking any activities related to the

6              OCFR project, unless and until defendants have complied with the NHPA, NEPA,

7              and the APA.

8      e)      An order awarding plaintiffs their reasonable attorneys fees and costs incurred in

9              this action pursuant to the Equal Access to Justice Act, 28 U.S.C. 2412; and

10     f)      Granting plaintiffs such additional relief as the Court deems just and equitable.

11     Respectfully submitted February 22, 2011.

12

13                              /s/ Marianne Dugan
                                Marianne Dugan, *pro hac vice*
                                (Oregon State Bar no. 93256)
14                              Lead Attorney for Plaintiffs

15

16

17

18

19

20

21

22

23

24