IGNACIA S. MORENO
Assistant Attorney General
JARED S. PETTINATO, MT Bar No. 7434
SAMANTHA FRANK, NY Bar No. SK-9874
Trial Attorneys
United States Department of Justice
Environment and Natural Resources Division
Natural Resources Section
P.O. Box 663
Washington, D.C.  20044-0663
Tel: (202) 305-0203
Tel: (202) 305-0474
Fax: (202) 353-0274
Jared.Pettinato@usdoj.gov
Samantha.Frank@usdoj.gov
*Attorneys for the Federal Defendants*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | | |
|---|---|---|
| KARUK TRIBE, KLAMATH-SISKIYOU WILDLANDS CENTER, ENVIRONMENTAL PROTECTION INFORMATION CENTER, and KLAMATH FOREST ALLIANCE, | ) ) ) ) ) ) ) | No. 3:10-cv-2039-WHA<br><br>Judge William H. Alsup |
| Plaintiffs, | ) ) ) | |
| v. | ) ) ) | **DEFENDANTS' BRIEF IN SUPPORT OF THEIR CROSS-MOTION FOR SUMMARY JUDGMENT AND IN RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |
| TYRONE KELLEY, in his capacity as Forest Supervisor, Six Rivers National Forest, and THE UNITED STATES FOREST SERVICE, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

1

# **TABLE OF CONTENTS**

2    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

3    STATUTORY BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

4        I.    The National Historic Preservation Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

5        II.   The National Environmental Policy Act  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

6        III.  The Healthy Forest Restoration Act  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

7    FACTUAL BACKGROUND  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

8        I.    The OCFR Project Goals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

9        II.   The Forest Service followed the Regional PA procedures  . . . . . . . . . . . . . . . . . . . 4

10       III.  The Forest Service allowed and responded to public input . . . . . . . . . . . . . . . . . . 6

11       IV.   Timber Products used trees adjacent to the spiritual trail as guy trees  . . . . . . . . . . 7

12       V.    The Forest Service and Plaintiffs discussed Plaintiffs' concerns by letters and in
13             meetings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

14   STANDARDS OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

15       I.    The Administrative Procedure Act  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

16       II.   Summary Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

17   ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

18       I.    Plaintiffs have forfeited their pre-ROD NHPA and NEPA claims because they
19             failed to raise them during the decision making process . . . . . . . . . . . . . . . . . . . 13

20             A.    Plaintiffs waived all of their pre-ROD NHPA and NEPA claims by failing to
                     include them in their comments during the NEPA comment
21                   process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
             B.    The HFRA and Forest Service regulations do not authorize judicial review
                     for the pre-ROD NHPA and NEPA claims because Plaintiffs failed to
22                   exhaust their administrative remedies  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

23       II.   The Forest Service Complied with the Requirements of the NHPA . . . . . . . . . . . 16

24             A.    The Regional PA covers the Project and the Forest Service Complied with
25                   the NHPA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

26             B.    The Forest Service is complying with the requirements of the
27                   Regional PA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

28

1.    The Forest Service provided opportunities for participation by the Tribe through the NEPA process as required under the Regional PA and continued consultation with the Tribe and SHPO during Project Implementation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

2.    The Forest Service is complying with the requirements the Regional PA regarding inadvertent effects . . . . . . . . . . . . . . . . . . . . . . . . . 21

C.    The Forest Service was not required to update the Determination of Eligibility for the Panamnik District Prior to Approving the Project . . . . 23

III.    The FEIS and the ROD satisfied NEPA, and no new, significant information has arisen that would prompt a supplemental EIS . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

A.    No environmental effects have arisen outside the scope of the FEIS and ROD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

B.    The Forest Service analyzed the environmental effects of the Project in the FEIS and ROD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

C.    The Project actions are consistent with the FEIS's purpose and need . . . . 30

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

2

<u>**TABLE OF AUTHORITIES**</u>

<u>CASES</u>

3

*Bastek v. Fed. Crop Ins. Corp.*,
    145 F.3d 90 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

4

5

*Border Power Plant Working Group v. DOE*,
    467 F. Supp. 2d 1040 (S.D. Cal. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

6

*Camp v. Pitts*,
    411 U.S.138 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

7

8

*Conn. Trust for Historic Pres. v. ICC*,
    841 F.2d 479 (2nd Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

9

*Darby v. Cisneros*,
    509 U.S. 137 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

10

11

*Decker v. U.S. Forest Serv.*,
    No. 09-cv-02675, 2011 U.S. Dist. LEXIS 11949 (D. Colo. Jan. 31, 2011) . . . . . . . . . 3, 16

12

*DOT v Pub. Citizen*,
    541 U.S. 752 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 14

13

14

*Friends of the Clearwater v. Dombeck*,
    222 F.3d 552 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

15

*George v. Bay Area Rapid Transit*,
    577 F.3d 1005 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

16

17

*Havasupai Tribe v. Robertson*,
    943 F.2d 32 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

18

19

*Idaho Sporting Cong. v. Rittenhouse*,
    305 F.3d 957 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

20

*Kleppe v. Sierra Club*,
    427 U.S. 390 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

21

22

*Lands Council v. McNair*,
    537 F.3d 981 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 11, 26, 29

23

*Marsh v. Or. Natural Res. Council*,
    490 U.S. 360 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 11, 25, 29

24

25

*McCarthy v. Madigan*,
    503 U.S. 140 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

26

*Mid States Coal. for Progress v. Surface Transp. Bd.*,
    345 F.3d 520 (8th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30

27

28

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Narragansett Indian Tribe v. Warwick Sewer Auth.,*
 334 F.3d 161 (1st Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Native Ecosystems Council v. Dombeck,*
 304 F.3d 886 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Nat'l Wildlife Fed'n v. Burford,*
 871 F.2d 849 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*N. Idaho Cmty. Action Network v. DOT,*
 545 F.3d 1147 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 25

*Nw. Motorcycle Ass'n v. USDA,*
 18 F.3d 1468 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Pac. Rivers Council v. U.S. Forest Serv.,*
 No. 2:05-cv-953, 2008 U.S. Dist. LEXIS 85403 (E.D. Cal. Sept. 18, 2008) . . . . . . . . . . 14

*Robertson v. Methow Valley Citizens Council,*
 490 U.S. 332 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*San Carlos Apache Tribe v. United States,*
 417 F.3d 1091 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 11

*Sierra Club v. Froehlke,*
 816 F.2d 205 (5th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Te-Moak Tribe of W. Shoshone v. U.S. Dep't of Interior,*
 608 F.3d 592 (9th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 17, 20, 21

*United States v. 0.95 Acres of Land,*
 994 F.2d 696 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*United States v. L.A. Tucker Truck Lines, Inc.,*
 344 U.S. 33 (1952) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Vt. Yankee Nuclear Power Corp. v. NRDC,*
 435 U.S. 519 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 14

**STATUTES**

5 U.S.C. § 706(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

5 U.S.C. § 704 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

16 U.S.C. §§ 470 to 470x-6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

16 U.S.C. § 470a(d)(6)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

16 U.S.C. § 470f . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

16 U.S.C. §§ 6501-6542 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

16 U.S.C. §§ 6501(1), 6512(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

1

16 U.S.C. § 6512(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

2

16 U.S.C. §§ 6514(g), 6515(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

3

16 U.S.C. § 6515(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

4

16 U.S.C. § 6515(c)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

5

16 U.S.C. § 6516 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

6

42 U.S.C. §§ 4321-4370 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3

7

42 U.S.C. § 4332(2)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 25

8

## RULES

9

Fed. R. Civ. P. 56(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

10

10B Charles Alan Wright et al., Fed. Practice & Procedure § 2733 (3d ed. 1998) . . . . . . . . . . . 12

11

## REGULATIONS

12

36 C.F.R. Part 21 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

13

36 C.F.R. §§ 215 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

14

36 C.F.R. § 218.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15-16

15

36 C.F.R. § 218.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

16

36 C.F.R. § 218.3(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

17

36 C.F.R. § 218.7(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

18

36 C.F.R. § 218.14 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

19

36 C.F.R. §§ 218.7, 218.10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

20

36 CFR 800 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 5, 6

21

22

36 C.F.R. § 800.4(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

23

36 C.F.R. § 800.14(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3, 4

24

36 C.F.R. § 800.14(b)(2)(iii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

25

36 C.F.R. § 800.14(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

26

36 C.F.R. § 800.16(l)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

27

40 C.F.R. § 1500.1(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

28

40 C.F.R. § 1502.9(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

66 Fed. Reg. 43, 384, 43,389 (Aug. 17, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

1

2

## **TABLE OF ACRONYMS**

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

| ACHP | Advisory Council on Historic Preservation |
|---|---|
| APA | Administrative Procedure Act, 5 U.S.C. §§ 701-706 |
| AR | Administrative Record |
| DEIS | Draft Environmental Impact Statement |
| FEIS | Final Environmental Impact Statement |
| EIS | Environmental Impact Statement |
| HFRA | Healthy Forests Restoration Act, 16 U.S.C. §§ 6501-6542 |
| MOA | Memorandum of Agreement |
| NEPA | National Environmental Policy Act |
| NHPA | National Historic Preservation Act, 16 U.S.C. §§ 470 to 470x-6 |
| The OCFR Project or the Project | Orleans Community Fuels Reduction and Forest Health Project (the OCFR Project or the Project) |
| PA | Programmatic Agreement |
| The Panamnik District | Panamnik World Renewal Ceremonial District |
| The Partnership | Plaintiffs, the Orleans/Somes Bar Fire Safe Council, and the Northcoast Environmental Center |
| Pl.'s Br. | Pls.' Mem. in Support of Mot. for Summ. J. |
| The Regional PA | First Amended Programmatic Agreement Among the [Forest Service], [SHPO[, and [ACHP] |
| SHPO | California State Historical Preservation Office |
| Supplemental EIS or SEIS | Supplemental Environmental Impact Statement |
| The Tribe | The Karuk Tribe |
| ROD | Record of Decision |

25

26

27

28

1

## INTRODUCTION

In the Orleans Community area in the Six Rivers National Forest, fire suppression allowed small trees, brush, and dead woody material to accumulate as ladder fuels that could lift wildfire into the forest canopy. Such fires become high intensity wildfires. OCFR Vicinity Map, Final Environmental Impact Statement (FEIS), Administrative Record (AR) 654, 820; OCFR Fuels Report, AR2304. The resulting conditions (1) made the area more susceptible to highly severe wildfire, (2) negatively impacted tree stand health, and (3) reduced the diversity of tree species in the area. *Id.* In the area surrounding Orleans, the fire risk is three and a half times the threshold to qualify as high risk. AR664. The United States Forest Service undertook the Orleans Community Fuels Reduction and Forest Health Project (the OCFR Project or the Project) to address these conditions by reducing hazardous fuel loads and by thinning the area. AR668.

The Forest Service designed this hazardous fuel-reduction and thinning project pursuant to the Healthy Forests Restoration Act, 16 U.S.C. §§ 6501-6542 (HFRA), which Congress enacted "to reduce wildfire risk to communities." 16 U.S.C. § 6501; AR663. Because the Forest Service used the HFRA framework, any appeals from the ROD or FEIS had to follow an abbreviated pre-decisional objection process. 36 C.F.R. Part 218. Plaintiffs filed an objection, AR622, but ultimately withdrew it. AR641.

The Forest Service analyzed the anticipated effects of the Project pursuant to the National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321-4370h (NEPA) and the National Historic Preservation Act (NHPA), 16 U.S.C. §§ 470 to 470x-6. *See generally* FEIS, AR654-940; Record of Decision (ROD), AR941-49; AR5489-524. The NEPA process involved interested parties, which included the Karuk Tribe (the Tribe), the other Plaintiffs, federal and state agencies, and community members. AR671. The Forest Service complied with the requirements of the NHPA by following the First Amended Programmatic Agreement (the Regional PA). AR5489-524. An agency may satisfy its NHPA requirements by following a programmatic agreement (PA) that governs the methods for implementing undertakings. *See* 36 C.F.R. § 800.14(b). Ultimately, the Forest Service chose a modified alternative proposed by Plaintiffs and others. AR671-72, 803. The Forest Service issued the ROD on August 15, 2008. AR941.

1    On September 24, 2009, the Forest Service executed a service contract with Timber Products

2 that authorized Timber Products to complete some of the thinning and fuels reduction. AR4309;

3 AR4311. Timber Products began implementing the OCFR Project on Units 1 and 2 on October 30,

4 2009. AR5624. During Project implementation, Timber Products inadvertently harvested seven trees

5 and harmed five other trees near a spiritual trail in the Panamnik World Renewal Ceremonial District

6 (the Panamnik District), which is a historic property eligible for the National Registry of Historic

7 Places. AR5623-25; AR4551, 4553; AR823; AR4049.

8    Plaintiffs have made conclusory allegations that the Forest Service violated the NHPA and

9 NEPA; however, Plaintiffs have forfeited most of their claims because they were not raised at the

10 appropriate times under the Forest Service's processes. Further, the Forest Service complied with the

11 NHPA by complying with the Regional PA, which despite Plaintiffs' assertions to the contrary, may

12 be used for NHPA compliance for the Project. Finally, Plaintiffs have identified no new, significant

13 environmental effects outside the scope of the FEIS that would require a supplemental environmental

14 impact statement (supplemental EIS). *See* 40 C.F.R. § 1502.9(c). This Court should deny Plaintiffs'

15 motion for summary judgment and grant the Forest Service's cross-motion.

16    **STATUTORY BACKGROUND**

17 **I.    The National Historic Preservation Act**

18    The NHPA, like NEPA, does not prohibit harm to historic properties, but creates obligations

19 "that are chiefly procedural in nature." *San Carlos Apache Tribe v. United States*, 417 F.3d 1091,

20 1097 (9th Cir. 2005). Both statutes "have the goal of generating information about the impact of

21 federal actions on the environment; and both require that the relevant federal agency carefully consider

22 the information produced." *Id.; see Te-Moak Tribe of W. Shoshone v. U.S. Dep't of Interior*, 608 F.3d

23 592, 608 (9th Cir. 2010).

24    Section 106 of the NHPA requires federal agencies to "take into account" the effect of their

25 actions on sites and structures eligible for inclusion in the National Register of Historic Places. 16

26 U.S.C. § 470f; *see also United States v. 0.95 Acres of Land*, 994 F.2d 696, 698 (9th Cir. 1993). The

27 ACHP has promulgated regulations under Section 106 to govern federal agency compliance with the

28 NHPA. *See* 36 C.F.R. Part 800. Under these regulations, an agency may satisfy its Section 106

1    requirements by entering into a programmatic agreement (PA) to govern the implementation of

2    undertakings.  *See* 36 C.F.R. § 800.14(b).  In cases where a programmatic agreement for agency

3    programs applies, "compliance with the procedures established by an approved programmatic

4    agreement satisfies the agency's section 106 responsibilities for all individual undertakings of the

5    program covered by the agreement until it expires or is terminated . . . ."    36 C.F.R. §

6    800.14(b)(2)(iii).  Under 36 C.F.R. § 800.14(f), when an agency uses a programmatic agreement, the

7    agency must ensure it includes "appropriate government-to-government consultation with affected

8    Indian tribes."

9    **II.    The National Environmental Policy Act**

10        Congress enacted NEPA to establish a consistent process for federal agencies to consider the

11    consequences of their actions upon the environment.  *See* 42 U.S.C. §§ 4321-4370.  To ensure

12    informed decision-making, NEPA requires agencies to analyze and to disclose significant

13    environmental effects, but it does not require agencies to make any particular decision.  *Robertson v.*

14    *Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).  NEPA "does not impose any substantive

15    requirements on federal agencies–it exists to ensure a process." *Lands Council v. McNair*, 537 F.3d

16    981, 1000 (9th Cir. 2008) (*en banc*) (citation and quotations omitted).  When an agency proposes a

17    "major Federal action[] significantly affecting the quality of the human environment," NEPA requires

18    preparation of an EIS.  42 U.S.C. § 4332(2)(C).  An agency need only supplement its analysis if the

19    agency makes substantial changes in the proposed action relevant to environmental concerns, or if

20    significant new information arises that will affect the quality of the environment "in a significant

21    manner or to a significant extent not already considered."  *Marsh v. Or. Natural Res. Council*, 490

22    U.S. 360, 374 (1989).

23    **III.    The Healthy Forest Restoration Act**

24        The Forest Service designed the Project using its HFRA authority, AR656, to "reduce the

25    threat of catastrophic wildfires to protect communities, firefighters, wildlife and forest health."

26    AR663; AR941; *see* 36 C.F.R. § 218.3.  Congress enacted HFRA in 2003 to "reduce wildfire risk to

27    communities, municipal water supplies, and other at-risk federal land" by, "[a]s soon as practicable,"

28    implementing "authorized hazardous fuel reduction projects."  16 U.S.C. §§ 6501(1), 6512(a); *Decker*

*v. U.S. Forest Serv.*, No. 09-cv-02675-PAB-CBS, 2011 U.S. Dist. LEXIS 11949, at *3 (D. Colo. Jan. 31, 2011).  It specifically targeted "Federal land in wildland-urban interface areas," *id.* § 6512, and directed the Forest Service to "give[] priority to authorized hazardous fuel reduction projects that provide for the protection of at-risk communities or watersheds or that implement community wildfire protection plans." *Id.* § 6513(a).

## FACTUAL BACKGROUND

### I.    The OCFR Project Goals

To reduce hazardous fuels, the Project will reduce hazardous fuels and thin approximately 2,698 acres on lands near and around the town of Orleans, California, in Humboldt County.  *See* Map 3, AR822.  Some, but not all, of the OCFR Project area overlaps with the Panamnik District.  Map 4, AR823.  The Forest Service concluded that the Project area, essentially the area in and around Orleans, "has a high potential for high-intensity, severe wildfires."  AR657; *see* AR2304.   Since 1973, the Forest Service has seen "at least six fires . . . within 10 miles of the [P]roject area that have exhibited extreme fire behavior."  AR665.  It aims to create "conditions that produce surface fire flame lengths less than four feet, resulting in less torching and reduced basal area mortality when a fire occurs within the [P]roject area.  These conditions contribute to fire resilient/resistant forests."  AR2308 (citations omitted).  The Project will create these conditions by "reducing surface and ladder fuels and . . . reduc[ing] canopy density . . . ."  AR2309.  Then, the Forest Service can "re-introduc[e] . . . natural and prescribed fire into the forests."  AR2308.

Reducing surface and ladder fuels not only would reduce the risk of high-severity fire, but also would support cultural burning.  AR944; AR667.  Tribes historically have burned areas "to maintain desirable forest conditions for the production and gathering of foodstuffs, basketry materials, and game species."  AR667. Through the OCFR Project, the Forest Service aims to "[i]ncrease the acres of vegetation available for maintenance through cultural burning."  *Id.*  In addition, by reducing "select canopy level trees," the Forest Service can restore "some important views for spiritual activities."  *Id.*

### II.    The Forest Service followed the Regional PA procedures.

In 2001, the Forest Service, the California State Historic Preservation Office (SHPO), and the Advisory Council on Historic Places (ACHP) executed the Regional PA pursuant to the NHPA's

1  regulations.  *See* 36 C.F.R. § 800.14(b).  The Forest Service, ACHP, and SHPO entered into the

2  Regional PA because they recognized that the Forest Service could implement many of its

3  "undertakings using procedures which have proven effective in managing and preserving historic

4  values in a more cost-effective manner than the undertaking-specific process outlined in 36 [C.F.R.]

5  800" (commonly known as the "Section 106 process").  AR5491.  The Regional PA expedites

6  compliance with the NHPA and, when the Forest Service administers projects in accordance with the

7  Regional PA, it "satisf[ies] the Forests' [36 C.F.R. Part 800] responsibilities."  AR5492; 36 C.F.R. §

8  800.14(b)(2)(iii).

9          Pursuant to the Regional PA, the Forest Service used the Project's NEPA process to provide

10  information to the public and to give interested parties and the public opportunities to comment.

11  AR5523; AR5493; AR5503 ("Forests shall use the public notification process embodied in the NEPA

12  . . . to comply with provisions for public notification, identification of interested parties, and public

13  participation found in 36 CFR 800.").  As the Forest Service explained in the FEIS, it complied with

14  the Regional PA because "historic and prehistoric cultural sites have been identified and protected."

15   AR705.  Specifically, the Forest Service conducted an intensive inventory which it documented in

16  its Cultural Resources Final Evaluation and in various Cultural Resource Inventory and Archaelogical

17  Reconnaissance Reports.  AR2065; AR5853-69; AR5870-78; AR5959-76.  It designed and planned

18  "[s]tandard resource protection measures . . . [for] those sites in and near the area of potential effect."

19  *Id.*  The Forest Service identified that the Regional PA "recommended specific protective measures,"

20  including "flagging sites or modifying project boundaries to avoid impacts . . .," and the Forest Service

21  planned to use these resource protection measures during Project implementation.  AR703.

22          The Forest Service started meeting with the Tribe about the Project in 2006, AR803.  The

23  Karuk Tribe made extensive comments during the NEPA process and explained the Panamnik District

24  occupied an important part of their culture; in response, the Forest Service planned the "[P]roject

25  objectives and design features . . . to protect the cultural and spiritual values of this portion of the

26  project area."  AR803.  The Forest Service concluded that "the proposed action alternative would not

27  have any significant adverse effects to existing cultural or spiritual uses[, but would] . . . enhance

28  many conditions on the landscape for the benefit of traditional and spiritual uses."  AR803.  For

Example, the Forest Service consulted with Tribal "spiritual practitioners [to determine] that a Karuk spiritual trail [in the Panamnik District], would not be negatively impacted by either the no action or proposed action alternatives."[1] AR703-04. By creating conditions appropriate for cultural burning, the Forest Service designed the Project to "[e]nhance cultural values associated with the Panamnik World Renewal Ceremonial District." AR704.

### III.    The Forest Service allowed and responded to public input.

The Forest Service began the public participation process under both NEPA and the NHPA in February 2006, when it sent letters to approximately 125 individuals and groups requesting public comment on its initial concept for the intended scope of the Project. AR671; Regional PA, Stip. VIII.A, AR5503 ("Forests shall use the public notification process embodied in [NEPA] to comply with provisions for public notification, identification of interested persons, and public participation found in 36 CFR 800."). It held a Round Table Public Meeting in March 2007. *Id.* In response to the public feedback, the Forest Service changed the project scope and repeated the scoping process beginning in October 2007. *Id.* The Forest Service met with the Karuk Tribe, industry representatives, environmental group representatives, and others "to develop a collaborative alternative" to analyze during the NEPA process. AR672. It held seven public field trips and held collaborative meetings in December 2007 and January 2008. AR947. The Forest Service issued the FEIS in June 2008.

Because Orleans is a "wildland interface communit[y] in the vicinity of Federal lands at high risk from wildfire . . . ." 66 Fed. Reg. 43,384, 43,389 (Aug. 17, 2001), the Forest Service analyzed the OCFR Project pursuant to the HFRA. 16 U.S.C. § 6512(a)(1); AR663. The HFRA objection process allows "[i]ndividuals and organizations who have submitted specific written comments related to the proposed" action to submit objections within thirty days of publication of the FEIS. 36 C.F.R. §§ 218.7, 218.10. Here, the Forest Service received one objection from Plaintiffs, the Orleans/Somes Bar Fire Safe Council, and the Northcoast Environmental Center (collectively, the "Partnership"). AR622-33. In that objection, the Partnership requested, among other things, (1) funds for the Karuk

---

[1] In addition, the Forest Service met with the Tribe on numerous occasions to discuss various aspects of the Project. *See, e.g.*, AR672; AR5664; AR5670-74; AR5680; AR5689; AR5699; AR5701; AR5722; AR5755; AR5785-87; AR5795-96; AR5797-98; AR5800; AR2472-73; AR2474-75.

1  Tribe to conduct monitoring, (2) "access to project files, budgets, and GIS information/maps," (3)

2  decision authority for the Partnership to prioritize the treatment sequence, (4) a procedure allowing

3  the Partnership to "influence contracts before they are signed," (5) notice and decision authority over

4  any mitigation needs that could arise during implementation, and (6) a "collaborative multiparty

5  monitoring, evaluation and accountability process . . . ." AR632. The Partnership and the Forest

6  Service resolved the issues raised in the objection through a signed Resolution Agreement on August

7  11, 2008. AR644-47. As part of that agreement, the Partnership formally withdrew its objection.

8  AR644.

9  **IV.     Timber Products used trees adjacent to the spiritual trail as guy trees.**

10         Timber Products began implementing the OCFR Project in Units 1 and 2 on October 30, 2009.

11  AR5624. Those units are a small fraction of the 238 units in the OCFR Project area. *Compare* Map

12  7 *with* Maps 5 and 6, AR824-26; AR847-57 (identifying 239 units); AR644 (dropping Unit 146).

13  Shortly before Timber Products started implementing the Project, the Karuk raised concerns that using

14  the yarders and their associated guy trees would cause damage to trees near the spiritual trail.

15  AR4784.[2] It also appears the Tribe had concerns about the contractor placing guy cable on the

16  spiritual trail. AR4868.

17         An alternative to using a yarder was using a yoader. *See* AR4919. Timber Products was

18  concerned that, if it had to use a yoader instead of a yarder, it would lose timber volume in the unit.

19  *Id.* The contract between the Forest Service and Timber Products shows the "requirements for cable

20  and skyline yarding equipment . . . on [the] Contract Area Map [according to certain] symbols . . . ."

21

22         [2] A yarder is a piece of equipment that uses a cable system to carry logs from areas with slopes, areas

23  where it would be difficult to reach the log, or areas where using other equipment would harm the soils.
*See* Logging System Powerpoint, AR5635-52. When using yarders, contractor employees attach a cable

24  beyond the location of the target log, and attach a cable behind the yarder (a back guy) for stability.
When attached to trees, one calls those trees "guy trees." After a yarder retrieves a log, a loader puts

25  it onto the truck for delivery to a mill. A "yoader" is a combination piece of equipment that can perform
both the yarding and loading functions, but it is less-efficient at yarding because it does not use

26  stabilizing back guys. For example, here, Timber Products could use a yoader to retrieve logs only 200
feet or closer to the yoader. AR5640; AR4919. By using back guys, a yarder can retrieve logs from

27  farther distances than a yoader. Contractor employees can use back guy trees in three ways: (1) it can
cut the tree and use the stump as the back guy tree, (2) it can strap the cable directly around the trunk

28  of the tree, which usually damages the tree's bark, and (3) it can strap the cable around the trunk of the
tree, but put spare branches or other materials between the cable and the tree trunk to protect the bark
on the tree. *See* AR5638; AR4799-4800.

DEFS.' BR. IN SUPPORT OF CROSS-MOT. FOR SUMM. J.
Karuk Tribe v. Kelley, No. 3:10-cv-2039-WHA                                     -7-

AR4391; AR4464 (map). That map did not make the distinction between a yarder and a yoader. The ROD and the FEIS similarly did not restrict the types of equipment that the contractor could use in those areas. *see generally* AR941-49; AR864.[3]  Therefore, the Forest Service concluded that the contract with Timber Products allowed Timber Products to use yarders with back guys that crossed the road from Units 1 and 2. *See* AR4784.  The Forest Service interpreted the Occupational Safety and Health Administration regulations to require the contractor employees to fell any guy trees if they were close enough that, if they fell, they would fall on the yarder; otherwise, contract employees could leave the guy trees standing. *Id.*; AR4788.  The Forest Service recognized that using back guys on Units 1 and 2 would require either (1) felling trees or (2) allowing the cables to rest on the spiritual trail. *Id.*

At first, the Forest Service allowed Timber Products to "use the guy trees as long as they protected them (Not damage them so it's noticeable from trail) . . . ." AR4784.  Later, the Forest Service allowed Timber Products "to strap the trees that would not need felling and those that would need falling for safety reason[]s (trees which would reach yarder location if they were pulled down) would be flush[-]cut and covered with dirt."  AR4810; *see* AR4799-4800 (pictures of strapping). From October 30 to December 21, 2009, Timber Products harvested seven trees and harmed five other trees. AR4551; AR4553; AR5624-25.  In addition, a cable had crossed the spiritual trail and piles of vegetation and downed trees were left, temporarily, in the area of the spiritual trail. AR5624-31.  On December 21, 2009, the Forest Service recognized that it "require[d] time to re evaluate the project and any potential consequences of a variety of issues recently brought to its attention.  A complete shut-down [including operations on Units 1 and 2] will allow an in[-]depth review of the project and help ensure successful completion."  AR4576.

---

[3] The FEIS leaves flexibility on the types of equipment to use depending on the location:
> 5. Within all areas that are to be logged with a yarder, all yarding except lateral yarding shall be accomplished with a skyline system, which supports products clear of the ground across buffer strips, and in other areas yard with one product endline suspended. . . .  Equipment must be capable of yarding from roadway with additional landing excavation to accommodate the yarder held to a minimum consistent with safe yarding operations.
> 6. In specific locations where spiritual values or natural resource considerations warrant, unconventional logging techniques would be used, such as horses, mini-yarders, multi-span skyline, grapple yarding or quad-runner with winch and/or arch would be used.

AR864.

1    **V.    The Forest Service and Plaintiffs discussed Plaintiffs' concerns by letters and in**
2         **meetings.**

3         The Tribe and the Forest Service met on November 25, 2009.  At that meeting, among other

4    things, the Tribe expressed willingness to accept strapping of guy trees as long as the Forest Service

5    did not fell "any more trees on or near the [spiritual] trail, only if absolutely necessary for safety; and

6    just for the remainder of unit 1 and for the already felled part of unit 2." AR4893 (emphasis removed).

7    In response, the Forest Service modified the contract with Timber Products to prohibit it from using

8    guy trees.  AR4550.

9         On December 8, 2009, members of the Tribe requested to meet with District Ranger Nolan

10   Colegrove and "expressed their frustrations that the OCFR [P]roject is once again causing damage to

11   the [spiritual] Trail." AR4942.  Colegrove met the Tribal representatives on the site, where the Tribal

12   representatives complained that Timber Products was "decking [temporarily storing] logs above the

13   [spiritual] trail," which "was causing damage."  *Id.*  The Forest Service met with the Tribe on

14   December 14, 2009, and the Tribe followed that meeting with a letter outlining its concerns.  AR4872;

15   *see also* AR5026; AR4582.  In December 2009, the Tribe requested the Forest Service to consult with

16   SHPO on the OCFR Project.[4]  AR5028.  At that point, the Tribe expressed for the first time its belief

17   that the NHPA required the Forest Service to consult with the SHPO for the OCFR Project.  *Id.*

18        On December 22, 2009, the Forest Service responded to the letter from the Tribal Chairman.

19   It sent a letter recognizing the concerns and "respectfully request[ing] a government-to-government

20   consultation meeting to discuss . . . [the] concerns." AR5007.  On January 6, 2010, the Tribe sent a

21   Letter of Complaint to the SHPO.  It argued that "[t]he PA is . . . inadequate to cover the extent of

22   potential impacts from the project."  AR5070.  It sent a second letter to the SHPO on January 22,

23   2010.  AR5090.  In that second letter, the Tribe complained for the first time that the Forest Service

24   took no "effort to update the [Determination of Eligibility for] the [Pananmnik] District as there have

25   been many new sites uses information and/or impacts identified within and adjacent to the Area of

26   Potential Effects for the OCFR project since the original determination of eligibility in 1978."  *Id.*

27

28
        ─────────────────
          [4]  Because it was following the procedures in the Regional PA, the Forest Service complied with the
        NHPA without consulting with the SHPO.

DEFS.' BR. IN SUPPORT OF CROSS-MOT. FOR SUMM. J.
Karuk Tribe v. Kelley, No. 3:10-cv-2039-WHA                                                    -9-

That Determination of Eligibility describes the reasons for which the property is eligible foron the National Register of Historic Places. *See* AR4051. The Forest Service responded to the Tribe's complaint letter on February 4, 2010. AR5157. It suggested "on-the-ground field reviews to ensure that implementation of logging plans is consistent with project objectives," that would include Tribal representatives, a monitor from the Partnership, a Timber Products representative, and Forest Service designees. *Id.* In addition, the Forest Service proposed allowing a "tribal monitor on site." *Id.*

The Parties continued their discussions on NHPA and NEPA compliance through the spring of 2010, but were unable to resolve their disagreements on whether the Project could move forward. AR5210. On April 3, 2010, Plaintiffs' counsel, Marianne Dugan, sent a letter claiming that the Forest Service might have to issue a supplemental environmental impact statement pursuant to NEPA. AR5349. Plaintiffs filed their Complaint on May 12, 2010. Docket Number (Dkt.) 1. The Parties held an in-person mediation session with Magistrate Judge Elizabeth D. Laporte on September 1, 2010. Dkt. 24. They continued their settlement discussions into November 2010, Decl. of Dugan ¶ 1, Dkt. 31-1, but they were ultimately unsuccessful.

The Forest Service continues to consult with the SHPO pursuant to Stipulation V of the Regional PA regarding the inadvertent effects during Project implementation. The Forest Service first contacted the SHPO in December 2009, in response to concerns raised by the Tribe. AR5623-25. On May 10, 11, and 12, 2010, the Forest Service met with the Tribe and with the SHPO for a field review of the Project area and program review. AR5474-75; AR5623. On August 31, 2010, the Forest Service wrote to the SHPO to seek formal concurrence with proposed measures to resolve any potential inadvertent effects as a result of the project implementation. AR5623. On February 19, 2011, the Forest Service met with the SHPO to continue to consult regarding potential mitigation measures. *See* Declaration of Julie Burcell (Burcell Decl.), ¶ 4. As the SHPO suggested in its March 3, 2011, letter to the Forest Service, the Forest Service has recently proposed to the Tribe that the parties memorialize the mitigation measures to address the adverse effects in a memorandum of agreement entered into pursuant to Stipulation V of the Regional PA, and it has invited the Tribe to be a consulting party in its development and a full signatory to that memorandum of agreement. *See* Burcell Decl., Ex. 1, 2.

1                        **STANDARDS OF REVIEW**

2 **I.**      **The Administrative Procedure Act**

3        "Judicial review of agency decisions under NEPA . . . is governed by the [APA], which

4 specifies that an agency action may be overturned only where it is found to be 'arbitrary, capricious,

5 an abuse of discretion, or otherwise not in accordance with law.'" *Native Ecosystems Council v.*

6 *Dombeck*, 304 F.3d 886, 891 (9th Cir. 2002) (quoting 5 U.S.C. § 706(2)(A)). Similarly, "the APA

7 established a specific mechanism for enforcing [the] NHPA." *San Carlos Apache Tribe*, 417 F.3d at

8 1095. To obtain relief under the APA, a plaintiff must show that the agency action it challenged was

9 arbitrary and capricious. *DOT v Pub. Citizen*, 541 U.S. 752, 763 (2004); *Kleppe v. Sierra Club*, 427

10 U.S. 390, 412 (1976) (requiring plaintiffs to carry the burden); *George v. Bay Area Rapid Transit*, 577

11 F.3d 1005, 1011 (9th Cir. 2009) (same). The "arbitrary and capricious standard" is necessarily a

12 deferential one. "The [agency's] action . . . need be only a reasonable, not the best or most reasonable,

13 decision." *Nat'l Wildlife Fed'n v. Burford*, 871 F.2d 849, 855 (9th Cir. 1989). As the en banc Ninth

14 Circuit reaffirmed, a court can "reverse a decision as arbitrary and capricious only if the agency relied

15 on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the

16 problem, or offered an explanation that runs counter to the evidence before the agency or is so

17 implausible that it could not be ascribed to a difference in view or the product of agency expertise."

18 *Lands Council*, 537 F.3d at 987 (quotations omitted). In other words, the reviewing court's task is

19 simply "to insure a fully informed and well-considered decision, not necessarily a decision that [the

20 court] . . . would have reached had [it] been [a] member of the decisionmaking unit of the agency."

21 *Vt. Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 558 (1978).

22        Moreover, *Lands Council* makes clear that a court reviewing an agency action is necessarily

23 at its most deferential when assessing the agency's consideration of technical matters. 537 F.3d at

24 993. In that role, the reviewing court is not itself "to act as a panel of scientists that instructs the

25 [agency] how to validate its hypotheses regarding wildlife viability, chooses among scientific studies

26 in determining whether the [agency] has complied with [its regulations], and orders the agency to

27 explain every possible scientific uncertainty." *Id.* at 988. That deference extends to agency

28 determinations whether new information is significant and requires a supplemental EIS. *Marsh,* 490

1  U.S. at 374, 377.

2  **II.     Summary Judgment**

3       Summary judgment is proper if the evidence "show[s] that there is no genuine issue as to any

4  material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

5  Because claims brought under the APA are appropriately decided without trial or discovery, on the

6  basis of an existing administrative record, such claims are properly decided on summary judgment.

7  *See* 10B CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 2733 (3d ed. 1998).

8  Courts use Rule 56 motions for summary judgment to review agency administrative decisions under

9  the APA.  *See*, *e.g.*, *Nw. Motorcycle Ass'n v. USDA*, 18 F.3d 1468, 1471-72 (9th Cir. 1994). Courts

10  base this review on the administrative record compiled by the agency.  *Camp v. Pitts*, 411 U.S.

11  138, 142 (1973) ("the focal point for judicial review should be the administrative record already in

12  existence, not some new record made initially in the reviewing court.").

13  **ARGUMENT**

14       Plaintiffs' claims fall into four categories:  (1) NHPA compliance before the ROD, (2) NEPA

15  compliance before the ROD, (3) NHPA compliance after the ROD, and (4) NEPA compliance after

16  the ROD.[5]

17       Plaintiffs argue that the Forest Service violated the NHPA because (a) it could not use the

18  Regional PA to address the effects on traditional cultural properties, (b) it failed to consider the effects

19  of Project on the Panamnik District before issuing the ROD, and (c) it failed to update the 1978

20  Determination of Eligibility for the Panamnik District (collectively, the pre-ROD NHPA claims). Pls.'

21  Mem. in Support of Mot. for Summ. J. (Pls.' Br.) 14-15, 17, Dkt. 42.  Plaintiffs did not raise these

22  claims in its comments or in the Partnership's HFRA objection.  AR622.  Further, the Partnership

23  ultimately withdrew its HFRA objection.  AR636.  This Court cannot address these claims because

24  Plaintiffs did not give the agency a chance to address them, first.  Even if this Court could address

25  _____

26      [5]As explained in Defendants' Notice of Lodging of the Supplemental Administrative Record, when
assessing whether the Forest Service complied with the NHPA or NEPA prior to adopting the ROD

27  (categories (1) and (2)), the APA limits this Court to considering the documents dated on or before that
decision.  Defs.' Notice of Lodging the Supp. Admin. R. and Post-Decisional Docs. 2-3, Dkt. 36.

28  Nevertheless, the Court can consider the entire set of documents (dated both before and after the ROD)
when assessing whether the Forest Service complied with the NHPA and NEPA during the Project's
implementation (claims (3) and (4)).  *Id.*

DEFS.' BR. IN SUPPORT OF CROSS-MOT. FOR SUMM. J.
Karuk Tribe v. Kelley, No. 3:10-cv-2039-WHA                                          -12-

those pre-ROD NHPA claims, the Forest Service followed the requirements of the Regional PA and appropriately offered the Tribe opportunities to participate in shaping the Project through the NEPA process and through the procedures under the Regional PA. Nothing required the Forest Service to update the Determination of Eligibility for the Panamnik District. Plaintiffs' pre-ROD NHPA claims have no merit.

For their pre-ROD NEPA claims, Plaintiffs argue that NEPA required the Forest Service to include mitigation measures related to guy trees in the contract and in the FEIS. Pls.' Br. 16. Plaintiffs argue that the Forest Service failed to analyze the environmental effects of the Project and that the Project fails to meet its purpose and need. Pls.' Br. 21-22. Just as Plaintiffs did not raise their pre-ROD NHPA claims, they did not raise these pre-ROD NEPA during the decisionmaking process–not in their comments on the DEIS, not in their objection to the FEIS, and not when they withdrew their objection to the Project. Therefore, the Court cannot address these claims. Even if it could, however, it would conclude that the Forest Service analyzed the effects of the Project and its chosen alternative is a rational approach for attaining the Project's purpose and need.

Plaintiffs post-ROD NHPA claim is that the Forest Service has not followed the NHPA during implementation because implementation in Units 1 and 2 resulted in inadvertent effects on the Panamnik District (the post-ROD NHPA argument). That claim has no merit because, as soon as the Forest Service learned of the inadvertent effects, it followed–and continues to follow–the Regional PA to mitigate those effects. The Forest Service approved the Project in compliance with the NHPA and continues to comply.

Finally, Plaintiffs' post-ROD NEPA claim is that the effects of the Project implementation show that NEPA requires the Forest Service to supplement its FEIS before the Project can proceed further. That is wrong. None of the effects Plaintiffs identify exceeds the scope of the FEIS or ROD, so they cannot be new, significant effects that change the scope of the Project. NEPA does not require any supplement. This Court should grant the Forest Service's cross-motion for summary judgment and deny Plaintiff's motion for summary judgment.

**I.     Plaintiffs have forfeited their pre-ROD NHPA and NEPA claims because they failed to raise them during the decisionmaking process.**

A.     Plaintiffs waived all of their pre-ROD NHPA and NEPA claims by failing to include

DEFS.' BR. IN SUPPORT OF CROSS-MOT. FOR SUMM. J.
Karuk Tribe v. Kelley, No. 3:10-cv-2039-WHA                                          -13-

1    <u>them in their comments during the NEPA comment process</u>.

2    The doctrines of waiver and exhaustion are separate ways Plaintiffs can forfeit claims.  Under

3    the waiver doctrine, "it is . . . incumbent upon [those] who wish to participate [in the administrative

4    process] to structure their participation so that it is meaningful, so that it alerts the agency to the

5    [participants'] position and contentions."  *Vt. Yankee*, 435 U.S. at 553.  The HFRA and the applicable

6    Forest Service regulations specifically limit administrative review to persons who submitted "specific

7    written comments" during the initial "scoping or the public comment" period."  16 U.S.C. §§ 6514(g),

8    6515(a)(3); 36 C.F.R. § 218.7(a).  In none of Plaintiffs' comments and letters to the Forest Service

9    during the NEPA comment period for the DEIS did Plaintiffs raise any of the pre-ROD NHPA or

10    NEPA claims that they are raising now.  AR1217; AR1237.  Accordingly, Plaintiffs have waived

11    them.  *DOT*, 541 U.S. at 764-65 ("Because respondents did not raise these particular objections to the

12    EA, . . . [they] have therefore forfeited any objection to the EA on [those] ground[s] . . . ."); *N. Idaho*

13    *Cmty. Action Network v. DOT*, 545 F.3d 1147, 1156 n.2 (9th Cir. 2008) (*NICON*) ("because the tunnel

14    alternative was not raised and identified until June 2006, well after the notice and comment periods

15    for the 1999 EIS and the 2005 EA closed, any objection to the failure to consider that alternative has

16    been waived."); *Pac. Rivers Council v. U.S. Forest Serv.*, No. 2:05-cv-953, 2008 U.S. Dist. LEXIS

17    85403, *18 (E.D. Cal. Sept. 18, 2008) ("Defendants are correct in asserting that a failure to raise

18    specific objections during that period results in a waiver of objections subsequently made.").

19    Plaintiffs complain that the Forest Service did not consult with the SHPO under the NHPA's

20    Section 106 process, but Plaintiffs did not reject that procedure in their comments on the DEIS.  *See,*

21    *e.g.*, AR921; AR2494.  Plaintiffs did not complain that the Forest Service did not allow consult

22    adequately on the Project.  Instead, the Tribe thanked the Forest Service "for th[e] opportunity to be

23    actively and meaningfully involved in the decision-making process."  AR1237.  Finally, Plaintiffs did

24    not contend that the NHPA required the Forest Service to update the Determination of Eligibility.

25    Because Plaintiffs did not raise these protestations at the time they commented on the DEIS, they are

26    waived.  *Vt. Yankee*; *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952) ("courts

27    should not topple over administrative decisions unless the administrative body not only has erred but

28    has erred against objection made at the time appropriate under its practice.").

Plaintiffs argue that "the agreed mitigations had not been included in the contract." Pls.' Br. 16-17 (quoting AR4788). Yet Plaintiffs never complained about the Forest Service failing to include those mitigation provisions in the DEIS, and they admit that it "somehow got missed in the document." AR4795. They did not claim the Forest Service failed to analyze the effects of the Project on cultural resources or that the Project would not accomplish its purpose and need. Pls.' Br. 21-22. Because Plaintiffs did not raise these issues in their comments on the DEIS, they have waived them. *Vt. Yankee*; *L.A. Tucker Truck Lines*.

By failing to raise these issues during the public comment period, Plaintiffs waived their pre-ROD NHPA and NEPA claims. This Court cannot overturn the Forest Service's decision now on the basis of these waived claims. *Havasupai Tribe v. Robertson*, 943 F.2d 32, 34 (9th Cir. 1991) ("Absent exceptional circumstances, such belatedly raised issues may not form a basis for reversal of an agency decision.").

> **B.**    The HFRA and Forest Service regulations do not authorize judicial review for the pre-ROD NHPA and NEPA claims because Plaintiffs failed to exhaust their administrative remedies.

Plaintiffs not only waived their claims, but also failed to exhaust their administrative remedies. The APA, 5 U.S.C. § 704, "requires that plaintiffs exhaust available administrative remedies before bringing their grievances to federal court" to give the agency the "first shot at resolving a claimant's difficulties." *Idaho Sporting Cong. v. Rittenhouse*, 305 F.3d 957, 965 (9th Cir. 2002). "Where Congress specifically mandates, exhaustion is required." *McCarthy v. Madigan*, 503 U.S. 140, 144 (1992); *Darby v. Cisneros*, 509 U.S. 137, 154 (1993).

The HFRA allows "an issue [to] be considered in the judicial review of an action . . . only if the issue was raised in [the] administrative review process." 16 U.S.C. § 6515(c)(2). To advance that desire for quick action, the HFRA establishes a "special administrative review process" for authorized hazardous fuel reduction projects. *See* 16 U.S.C. § 6516; 36 C.F.R. §§ 218.1, *et seq.* Authorized hazardous fuel reduction projects are not subject to the same notice, comment, and appeal provisions under 36 C.F.R. §§ 215, *et seq.* that are normally applicable to proposed actions. *See* 36 C.F.R. § 218.3(a). Instead, the HFRA and the Forest Service's implementing regulations limit administrative review to a single objection in response to an Environmental Impact Statement, but prior to the ROD.

1   *See* 16 U.S.C. § 6515(a)(1)  ("predecisional administrative review process . . . will serve as the sole

2   means by which a person can seek administrative review regarding an authorized hazardous fuel

3   reduction project on Forest Service land."), (2); 36 C.F.R. § 218.1; *Decker*, 2011 U.S. Dist. Lexis

4   11949, at *4 (citing 36 C.F.R. § 218.1).  The Forest Service's predecisional administrative regulations

5   confirm that judicial review of "an authorized hazardous fuels reduction project is premature and

6   inappropriate" unless plaintiffs provided comments during the NEPA process and the objection

7   process.  36 C.F.R. § 218.14.  The HFRA and implementing regulations require Plaintiffs to have

8   raised their claims in their objection before this Court has authority to adjudicate them.  *See Bastek*

9   *v. Fed. Crop Ins. Corp.*, 145 F.3d 90, 94-95 (2d Cir. 1998) ("It is hard to imagine more direct and

10  explicit language requiring that a plaintiff suing the [Forest Service] . . . must first turn to any

11  administrative avenues before beginning a lawsuit." (quotations and citations omitted)).

12       The language of Plaintiffs' objection is clear, and Plaintiffs did not raise any of these pre-ROD

13  NEPA and NHPA claims in their objection.  Pls.' Br. 6-7; AR622.  Because Plaintiffs did not object

14  to these aspects of the Project in their objection, they failed to exhaust their administrative remedies

15  and the claims were forfeited.  *Decker* (dismissing claims that were not raised in an HFRA objection).

16       Most strikingly, not only did Plaintiffs fail to raise their pre-ROD NHPA and NEPA claims

17  in their objection, they were sufficiently satisfied with the resolution of their actual objections to the

18  Project that they withdrew their objection and permitted the Project to proceed.  AR644 ("We are

19  withdrawing our objection.").  Because Plaintiffs were satisfied with the resolution of the only

20  complaints on the Project that they actually raised in the administrative review process, they should

21  not be heard now about other aspects of the Project that were allegedly inadequate at the time the

22  Forest Service signed the ROD.  *See Bastek*, 145 F.3d at 94 ("if the statute at issue explicitly mandates

23  exhaustion as a prerequisite to judicial review, it must be enforced.").

24  **II.     The Forest Service Complied with the Requirements of the NHPA**

25       Even if the Court were to consider Plaintiffs' pre-ROD NHPA claims, the administrative

26  record shows that the Forest Service fully complied with the requirements of the NHPA through the

27  Regional PA prior to Project approval.  After the ROD and during Project implementation, the Forest

28  Service has continued to comply with the requirements of the Regional PA.

A.     The Regional PA covers the Project and the Forest Service Complied with the NHPA.

Plaintiffs' attempt to argue that the Regional PA does not cover Traditional Cultural Properties such as the Panamnik District is contradicted by the plain language of both the NHPA and the Regional PA.  *See* Pls.' Br. 14-15.  As such, the Forest Service's decision to utilize the Regional PA for the Project was not arbitrary nor capricious, and should be upheld by the Court.

The NHPA regulations define an historic property as "any prehistoric or historic district, site, building, structure, or object included in, or eligible for inclusion in, the National Register of Historic Places," which "include[s] properties of traditional religious and cultural importance to an Indian tribe or Native Hawaiian organization and that meet the National Register criteria."   36 C.F.R. § 800.16(l)(1).[6]  The Regional PA similarly defines an historic property as "any prehistoric or historic district, site, building, structure, or object, and its associated artifacts, remains, features, settings, and records, that is either listed in or has been determined eligible for inclusion in the [National Register of Historic Places]."  AR5494.  Thus, under the terms of the Regional PA and the NHPA, the Regional PA may be used in cases where projects contain Traditional Cultural Properties.

The Forest Service issued the ROD authorizing the Project on August 15, 2008, and Project implementation began on October 30, 2009.  AR948-49; AR5624.  It was not until May 2010 that SHPO considered the Regional PA inappropriate for projects that could affect Traditional Cultural Properties.  *See* AR5394.  However, prior to adopting the ROD in 2008, neither SHPO or Plaintiffs had expressed that concern, and therefore the Forest Service's decision to utilize the Regional PA for the Project in 2008 was neither arbitrary nor capricious.  Indeed, a December 13, 2010, letter from the Regional Forester to Forest Supervisors clarifying when the Regional PA may be used for projects confirms that the Forest Service's use of the Regional PA for the Project was in compliance with the NHPA.  *See* AR6019.

During the NEPA process for the Project, the Forest Service made it abundantly clear that it had decided to use the Regional PA to comply with the NHPA in the FEIS.  *See* AR704-705 (stating

---

[6] "The term 'traditional cultural property' or 'TCP,' is a term used by the National Park Service to refer to 'properties of traditional religious and cultural importance' that may be eligible for listing on the National Register under 16 U.S.C. § 470a(d)(6)(A)."  *Te-Moak Tribe*, 608 F.3d at 608 n.16 (citing National Park Service National Register Bulletin 38).

DEFS.' BR. IN SUPPORT OF CROSS-MOT. FOR SUMM. J.
Karuk Tribe v. Kelley, No. 3:10-cv-2039-WHA                                          -17-

that the Regional PA was being used for NHPA compliance); AR872-73 (setting out design features and applicable standards to protect cultural resources such as the Panamnik District). The FEIS identified that the Regional PA's standard resource protection measures applied to the Project. AR703, 705; AR872-73. These protection measures included "flagging sites or modifying project boundaries to avoid impacts." *Id.* The FEIS also states that an "archaeological reconnaissance was conducted on the project area and recorded in a Cultural Resource Inventory Report. . . which is on file in the Heritage Department of the Six Rivers National Forest Supervisor's office."[7] AR705. The Forest Service appropriately used the NEPA process to inform the public of this decision and to solicit comments under the terms of the Regional PA, which states that the NEPA process is to be used to inform the public and solicit comments. AR 5503-04; AR5523-24 (Regional PA, Attach. D, outlining steps of public participation). The Tribe was obviously well aware during the NEPA review that the Forest Service intended to use the Regional PA for this Project. *See, e.g.*, AR921 (summarizing public comments by the Tribe on the DEIS discussing use of the Regional PA); AR2494 (Tribe's comments on the DEIS).[8]

The SHPO's actions also revealed that the Regional PA was intended to cover the Project, despite Plaintiffs' assertions to the contrary.[9] *See* Pls.' Br. 15. In December 2009, the Forest Service initiated communications with the SHPO, pursuant to Stipulation V of the Regional PA, regarding concerns raised by the Tribe about inadvertent adverse effects from the Project's implementation. AR5623. On May 10, 11, and 12, 2010, the Forest Service met with the SHPO and with the Tribe to

---

[7] The Forest Service completed a Cultural Resources Final Evaluation to evaluate the Project's impacts on cultural resources within the Project area. AR2065. This included an examination of the archaeological site records, maps, and geographic information system data, and 17 cultural resource inventories that had previously been completed within the Project area between 1978 and 1999, and that included interviews with local Karuks and other ethnnographic information, an archaeological field reconnaisance, and field inventories. AR2065-2069; AR701-705.

[8] In addition to the myriad of times in the FEIS where the Forest Service discussed the use of the Regional PA, the Regional Forester was quite clear in the December 2010 directive to the Forest Supervisors that the suspension of the use of the Regional PA for the Six Rivers National Forest only applied to projects approved after June 4, 2010. AR6019, referencing AR5618-19. "For projects approved before this date, the Six Rivers National Forest should continue to implement the project pursuant to the Regional PA." *Id.* This was because the decision was not "intended to revisit or reopen any decisions made prior to June 4, 2010 to approve a project." *Id.*

[9] Indeed, Plaintiffs themselves point to a statement by SHPO which shows that the Regional PA is in use for the Project. *See* Pls.' Br. 14, citing AR5207.

discuss the inadvertent effects and potential mitigation measures. AR5394; AR5474-75. On August 31, 2010, the Forest Service wrote to the SHPO to follow up on prior discussions and to seek concurrence in resolving the inadvertent effects pursuant to Stipulation V of the Regional PA. AR5623-33. On March 3, 2011, the SHPO responded by recognizing in the second sentence of the letter that "you have an initiated consultation pursuant to *Stipulation V of the [Regional PA]. . . .*" *See* Burcell Decl., Ex. 1 (emphasis added). The letter goes on to state that "*the Forest had made use of the Regional PA*" in implementing the project.[10] *Id.* The SHPO also proposed memorializing agreed-upon mitigation measures to address the adverse effects in a memorandum of agreement (MOA) under the Regional PA and to invite the Tribe to be a consulting party in its development and a full signatory to it, while recognizing that if such a MOA cannot be developed, "the provision for requesting the Advisory Council on Historic Preservation comments *as provided in stipulation V of the Regional PA* will be followed." *Id.* (emphasis added).

Because the Regional PA covers the Project, Plaintiffs' arguments regarding a lack of compliance with specific provisions of the Section 106 regulations are misplaced, and this Court should disregarded them.

> **B.**      The Forest Service is complying with the requirements of the Regional PA.

>> 1.      *The Forest Service provided opportunities for participation by the Tribe through the NEPA process as required under the Regional PA and continued consultation with the Tribe and SHPO during Project Implementation.*

Plaintiffs claim that the Project went "forward without consultation and evaluation of the impacts." Pls.' Br. 16. Prior to implementation of the Project, however, the Forest Service took into consideration the views of the Tribe regarding the Project. Under Stipulation VII of the Regional PA, the Forest Service is required to use the NEPA process to solicit comments from the public. AR5503. The Regional PA also recognizes the special role played by Native Americans, requiring the Forest Service to ensure their concerns are taken into consideration as part of that process. AR5524; AR5503. In keeping with this, the Forest Service began discussions with the Tribe regarding the proposed Project even before the scoping letter was sent out by the Forest Service under NEPA. AR5

---

[10] SHPO's letter necessarily took into consideration Plaintiffs' January 6, 2010 letter, which stated that the Regional PA was inadequate to cover the project, AR5070, and the existence of this lawsuit. *See* Burcell Decl., Ex. 1.

1    (email from Forest Service to Tribe).  The Forest Service met with the Tribe on numerous occasions

2    during the pendency of the NEPA review process to discuss various aspects of the Project.[11]  The

3    Forest Service also sought to establish formal government-to-government consultation with the Tribe.

4    AR1237-63; AR5667-68; AR5675-76; AR5773-73.  In addition, the Forest Service asked the Tribe

5    to serve on the interdisciplinary team for the Project, stating that "[t]his cooperative effort is in the best

6    interest of all in assuring that the [Project] meets the needs of the traditional uses within the

7    [Panamnik] District and does not adversely affect the uses or the District's eligibility to the National

8    Register of Historic Places." AR5692; *see* AR5698 (Tribe executing MOU).[12]  The Tribe provided

9    extensive written comments on the DEIS, which the Forest Service summarized and responded to in

10   the FEIS.  AR1237-63; *see generally* AR906-940.  The FEIS also expressly recognized the concerns

11   raised by the Tribe resulting from the consultation and collaboration that occurred.  AR672-73.  Thus,

12   the Forest Service clearly complied with the requirements of the Regional PA with regard to the Tribe.

13        As for consultation with SHPO, the Regional PA states that where effective protection

14   measures will be employed following an intensive inventory, "no review or consultation with the

15   SHPO or ACHP is required prior to implementing an undertaking."    AR5498 (Stipulation

16   III(D)(3)(a)). The Forest Service completed such an intensive inventory which is documented in

17   various Cultural Resource Inventory/Archaeological Reconnaissance reports.  AR5853-69; AR5870-

18   78;  AR5959-76; AR5979-6018; *see* AR705.

19        Plaintiffs' concerns were expressed and, whether or not resolved to Plaintiffs' satisfaction, the

20   Forest Service considered them in compliance with the NHPA and the Regional PA.  *See Te-Moak*

21   *Tribe*, 608 F.3d at 607 (Section 106 "is a 'stop, look and listen' provision") (internal citation omitted);

22   *Conn. Trust for Historic Preserv. v. ICC*, 841 F.2d 479, 484 (2nd Cir. 1988) ("NEPA and NHPA

23   require only that agencies acquire information before acting.").  As the First Circuit has recognized,

24   "consultation is *not* the same thing as control over a project." *Narragansett Indian Tribe v. Warwick*

25   *Sewer Auth.*, 334 F.3d 161, 168 (1st Cir. 2003) (emphasis added).  Nor does Section 106 dictate

26

27        [11] *See, e.g.,* AR672; AR5664; AR5670-74; AR5680; AR5689; AR5699; AR5701; AR5722; AR5754-
28   55; AR5785-87; AR5795-96; AR5797-98; AR5800; AR2472-73; AR2774-75.

     [12] The Tribe subsequently withdrew from the interdisciplinary team.  AR 5775-79.

1    particular outcomes.  *See Te-Moak Tribe*, 608 F.3d at 607.

2              2.    *The Forest Service is complying with the requirements the Regional PA*
                   *regarding inadvertent effects.*
3

4          The Forest Service included the standard resource protection measures in the treatment unit

5    cards for Units 1, 2, and 51, which were the units where there may be impacts to the Panamnik

6    District, and included them in the contract with Timber Products.  AR4516; AR4519; AR4512;

7    AR4343-44.    Despite the Forest Service's efforts, during Project implementation, there were

8    inadvertent adverse effects to the Panamnik District.  *See* AR5624-5625.  After these inadvertent

9    effects were brought to the Forest Service's attention by the Tribe, the Forest Service began

10   discussions and consultation with the Tribe and the SHPO.  *See* AR5623-25.  The Forest Service also

11   began working with the contractor as early as November 2009 to ensure that work was done in a way

12   to avoid culturally sensitive resources.  AR4564; AR4548; AR4547.  The Forest Service also worked

13   to update "stand cards," which provided information on each Unit, in the Project area.  AR5031;

14   AR5032; AR5035; *see also* AR4921 (requesting archeologist to complete flagging of cultural cites

15   and that a tribal representative be notified for review of protection measures prior to any remaining

16   operations); AR4941 (following up on flagging).  On December 21, 2009, pursuant to Stipulation V

17   of the Regional PA, the Forest Service suspended the contractor's implementation of the Project and

18   all Project activities ceased.  AR4576.  Implementation of the Project is still currently suspended and

19   operations have not resumed.  *See* Burcell Decl., ¶ 8.

20         As the Forest Service has acknowledged, the inadvertent effects identified for the most part

21   cannot be remedied, as they are past effects.  AR5624-25.  As for certain other effects, such as the

22   existence of vegetative piles, the Forest Service will remedy those effects as soon as possible.[13]  *Id*.

23   Further, the Forest Service is currently consulting with the SHPO and seeking concurrence for

24   proposed mitigation for inadvertent adverse effects that can be remedied pursuant to Stipulation V

25   of the Regional PA.  *See* AR5037-39; AR5623-25; Burcell Decl., ¶ 4 (detailing a February 2011 meeting

26

27      [13] As the Forest Service explained in the August 31, 2010 letter to the SHPO, the Forest Service
        intended to remove piles of vegetative and downed the curios prior to ceremonies in mid-August 2010,
28   "but the limited operating period for nesting bald eagles did not end until August 31, 2010."  AR5624-
        25.  The Forest Service will implement those measures as soon as possible, but that litigation may delay
        implementation of these measures.  AR5624.

DEFS.' BR. IN SUPPORT OF CROSS-MOT. FOR SUMM. J.
Karuk Tribe v. Kelley, No. 3:10-cv-2039-WHA                                                  -21-

1  between the Forest Service and SHPO to consult regarding potential mitigation measures), Ex. 1. The

2  proposed measures include future flagging of hand treatment areas for complete avoidance, ensuring

3  an archaeologist is on site during all implementation activities in sensitive areas and allowing a tribal

4  consultant to also be present. AR5625. This monitoring will be done pursuant Stipulation IV(C) of

5  the Regional PA. AR5500-01.

6        On January 25, 2010, the Forest Service and the Tribe participated in government to

7  government consultation, during which a number of remedies were proposed, including on the ground

8  reviews by a Forest Service archeologist to ensure implementation is consistent with project

9  objectives, that a tribal monitor be on site, and that the Forest Service archeologist continue to review,

10  identify and flag Traditional Cultural Properties. *See* AR5079; AR5455-56. In February 2010, the

11  Forest Service and the Tribe scheduled a meeting for a field review. AR5172. On May 10 and 11,

12  2010, the Forest Service met with the Tribe and the SHPO for a program review. AR5474-75;

13  AR5623. As suggested by the SHPO, the Forest Service has proposed memorializing the agreed-upon

14  mitigation measures to address the adverse effects in a MOA pursuant to Stipulation V of the Regional

15  PA and invited the Tribe to be a consulting party in its development and a full signatory to that MOA.

16  *See* Burcell Decl., Ex. 1, 2. The recommendations for mitigation measures identified in the May 2010

17  program review by SHPO, the Forest Service and the Tribe, and the recommendations for mitigation

18  measures in the August 31 letter will serve as a basis for the MOA. *See* Burcell Decl., Ex. 2.

19        Finally, the Forest Service did not dismiss the Tribe's concerns about inadvertent effects

20  during Project implementation, as alleged by Plaintiffs. *See* Pls.' Br. 16. For example, in a November

21  16, 2009 email between Forest Service personnel, it states that the contractor had been "informed of

22  the need to protect the [spiritual] trail." AR4820. Likewise, a Work Order was issued on November

23  30, 2009, suspending tree falling operations in Unit 2. AR4574. On December 8, 2009, the Forest

24  Service directed the contractor not to deck logs above the road and to get all of the remaining logs in

25  Units 1 and 2 off the cut bank. AR4548. Ultimately, in response to concerns raised by the Tribe, on

26  December 21, 2009, the Forest Service suspended implementation of the Project. AR4576. This

27  Court should therefore find that the Forest Service has complied with the terms of the Programmatic

28  Agreement during the course of Project implementation and following suspension of the Project.

C.    The Forest Service was not required to update the Determination of Eligibility for the Panamnik District Prior to Approving the Project.

Plaintiffs are similarly incorrect in arguing that the Forest Service violated the NHPA because the 1978 Determination of Eligibility for the Panamnik District was not updated prior to approval of the Project. AR4049-51. 36 C.F.R. § 800.4(c)(1) simply does not require that a Determination be updated, as Plaintiffs imply. *See* Pls.' Br. 17. Rather, 36 C.F.R. § 800.4(c)(1) states: "[t]he passage of time, changing perceptions of significance, or incomplete prior evaluations *may* require the agency official to reevaluate properties previously determined eligible or ineligible." (Emphasis added). Here, that was not necessary prior to approval of the Project because the Forest Service considered all of the updated information that had been provided since the 1978 Determination when considering impacts to the Panamnik District. AR2065-69. For example, the Forest Service used information provided by the Tribe in October 2007, which identified the footprint of the Panamnik District on maps and notes that the project spans across the District. AR5711-17; *see also* AR5759; AR5842. The FEIS notes the Tribe's concerns regarding the Panamnik District, and includes a map showing the District. AR672; AR823. Indeed, the Project was designed to enhance elements of the Panamnik District that contribute directly to elements contributing to its National Register eligibility. AR2065-73; *see* AR701-705; AR803.

Plaintiffs attempt to rely on an email sent by a Forest Service archaeologist, which itself provides a solution to dealing with the archaeological sites within the Project area–flagging and avoiding those sites–a mitigation measure intended to be employed here. *See* AR4776;703-05; 5514-19. The Forest Service also stated in its August 31, 2010 to letter to the SHPO:

> To ensure protection of cultural resources as Project implementation continues, the Forest will flag hand treatment units for complete avoidance, ensure that an archaeologist is present during all implementation activities in sensitive areas, and allow a tribal consultant to be present as well.

AR5623-33 at 5625.

Further, the Forest Service's Treatment Unit Information Cards state that the standard resource protection measures to be employed within the Panamnik District include the requirement to "protect all known & *new* sites." AR4517 (emphasis added); AR4519; AR4522-23. Additional mitigation measures to be implemented include monitoring throughout implementation. *Id.*

In addition, the Regional PA specifically provides that where a project will be managed and maintained by using the Standard Resource Protection Measures out in Attachment C, "no NRHP [National Register of Historic Properties] evaluation is required prior to implementing an undertaking." AR5497, referencing AR5514-19. Even so, the Forest Service, based on the recommendation of the Heritage Program Manager, intends to complete an update of the Determination of Eligibility for the Panamnik District and has assured the SHPO that "the activity will be a future section 110 [of the NHPA] priority." AR5625. While Fiscal Year 2011 funding has not yet been approved by Congress, funding has been allocated through the Forest Service's budget planning process for updating the NRHP eligibility. *See* Burcell Decl., ¶ 6. In Fiscal Year 2010, the Forest Service had secured funding for these Section 110 activities, but the Forest Service had not received concurrence from SHPO. *Id.* As a result, the Forest Service could not move forward with the Section 110 activities. *Id.* The Forest Service has consulted with the Tribe regarding these Section 110 activities and based on the Tribe's input, the Forest Service is developing an agreement with Humboldt State University to update the nomination. *Id.*

As the Forest Service has complied with the requirements of the Regional PA and the NHPA, this Court should grant the Forest Service's cross-motion for summary judgment and deny Plaintiffs' motion for summary judgment on the NHPA claims.

**III.    The FEIS and the ROD satisfied NEPA, and no new, significant information has arisen that would prompt a supplemental EIS.**

A.    No environmental effects have arisen outside the scope of the FEIS and ROD.

Plaintiffs argue that the environmental effects of the Project implementation exceeded the scope of the FEIS and ROD, so NEPA requires the Forest Service to complete a supplemental EIS. Pls.' Br. 18. Plaintiffs clearly dislike the methods the Forest Service has used to implement the Project, but the facts do not support their allegations. The legal theories into which Plaintiffs attempt to shoehorn their facts provide no avenue for relief, and the scant legal support Plaintiffs provide for their arguments belies their weakness. In their entire NEPA section, Plaintiffs cite only one case in support of their arguments, and that is for the general, non-controversial proposition that agencies must prepare supplemental EISs in certain circumstances. Pls.' Br. 18-23. The Project implementation did not generate significant new information requiring a supplemental EIS.

An agency must supplement an EIS only in the narrow circumstances when(1) "there remains 'major Federal actio[n]' to occur," (2) there is "new information" (3) that "show[s] that the remaining action will 'affec[t] the quality of the human environment' in a significant manner or to a significant extent not already considered." *Marsh*, 490 U.S. at 374. To prevail on their supplemental EIS claim, Plaintiffs must demonstrate that the Forest Service's decision not to supplement the FEIS is "arbitrary and capricious." *Id.* at 375. As the Supreme Court stated, "an agency need not supplement an EIS every time new information comes to light after the EIS is finalized. To require otherwise would render agency decisionmaking intractable, always awaiting updated information only to find the new information outdated by the time a decision is made." *Id.* at 373. Accordingly, a supplement is necessary only "if the new information is sufficient to show that the remaining action will 'affec[t] the quality of the human environment' in a significant manner or *to a significant extent not already considered*." *Id.* at 374 (quoting 42 U.S.C. § 4332(C); emphasis added); *NICON*, 545 F.3d at 1157. Thus, "not every new circumstance, however small, requires filing a [supplemental EIS]; the new circumstance must present a *seriously* different picture of the environmental impact of the proposed project from what was previously envisioned." *Sierra Club v. Froehlke*, 816 F.2d 205, 210 (5th Cir. 1987). The Ninth Circuit has cautioned courts that "the threshold decision not to supplement an EIS [should not] become as burdensome as preparing the supplemental EIS itself, [or] the continuing duty to gather and evaluate new information could prolong NEPA review beyond reasonable limits." *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 560 (9th Cir. 2000) (quotations and alteration omitted).

Plaintiffs argue that the Project effects are outside the scope of the FEIS because "[t]he skyline corridors in the project . . . are approximately 20 to 30 feet wide on average." Pls.' Br. 18. The Tribe made similar claims at a November 24, 2009, meeting. AR4866. The record does not support this claim. In fact, the Tribe's own notes of that November 2009 meeting show that the Forest Service had "marked an 8-foot wide corridor . . . [and that] the add-on was only in an 8-foot wide area." AR4866. The FEIS anticipated that the "clearing for skyline corridors [would be] (10 feet wide)." Because the skyline corridors are 8 feet wide and the FEIS evaluated the impacts of corridors 10 feet wide, this is not new information that triggers the duty to prepare a supplemental EIS.

Next, Plaintiffs allege that "[t]he clearings. . . are larger than were evaluated and approved for the OCFR project; landings were analyzed to be .25-0.5 acres in size." Pls.' Br. 18. Landings are areas where "[t]reetops, unutilized material, and cut and removed material would be decked." AR676. The FEIS expected that all landings would be less than 0.5 acres in size except the landings for helicopters. AR678. When Plaintiffs identified that the contract would allow larger landings than the FEIS allowed, the Forest Service amended its contract with Timber Products to ensure that all landings sizes conformed to the FEIS. AR5314; AR5202; AR5634 ("The purpose of this modification is to establish that landings size will not exceed [0].5 acre for this project."). Because the sizes of the landings are within the FEIS allowances, there is no new information to trigger a supplemental EIS.

Plaintiffs argue that the NEPA analysis for "[t]he OCFR project required that hardwoods be retained and protected from 'incidental' injury, in part by directional felling of conifers." Pls.' Br. 19. Plaintiffs mischaracterize the ROD and the record. Pls.' Br. 19 (citing AR1959-60 (discussing habitat areas); AR5479 (directional felling around water lines, trails, etc.); AR5656 (discussing the Hazel Thin Project)). The FEIS required the Forest Service to "maintain or enhance existing hardwoods where they are still present in reasonable numbers and in such a condition that they can respond to increased growing space, light, and soil moisture." AR717. It "assume[d] that commercial thinning by ground or skyline logging systems in early mature and older stands would result in 25 percent loss of hardwood trees between 6 and 20 inches [diameter at breast height]." AR717-18. Although the FEIS required some directional felling, it was unrelated to hardwoods. AR769 ("protect stream banks); AR864 ("protect[] . . . sensitive species"); AR869 (same), ("protect[ing] . . . water lines, trails, historic ditches, . . . etc."). Plaintiffs have not suggested that the impact to hardwoods has exceeded the 25 percent loss considered in the FEIS. Thus, the effects of the Project implementation on hardoods was clearly within the scope of the FEIS and does not constitute significant new information requiring consideration in a supplemental EIS.

Plaintiffs also allege that the Forest Service used a road "in wet weather conditions," and that the Forest Service had not analyzed those impacts in the FEIS and ROD. Pls.' Br. 19. The FEIS specifically allowed wet weather operations. AR867 ("Skyline [wet weather operations] may be allowed along system roads with appropriate preventive measures as per [wet weather operations]

standards."). On a December 1, 2009, field trip to investigate the Tribe's allegations of improper wet weather operations, the Forest Service found "[n]o sediment flow into natural drainages was occurring," and no evidence that the water was creating ruts in the road; but saw erosion prevention techniques. AR4900-05. It concluded that "[t]he units were dry enough to have allowed ground-based operations." *Id.*; *see also* AR4553 ("No detrimental soil conditions were found and *sale was compliant with wet weather operations standards*." (emphasis added)). When the wet weather required it, the Forest Service "suspend[ed] hauling." *E.g.*, AR4974; AR4571. Because the plain language of the FEIS allowed wet weather operations as long as Timber Products followed the protocols, and the Forest Service found that Timber Products was following the protocols, any effects were plainly within the scope of the FEIS and do not require a supplemental EIS.

When the Forest Service suspended contract implementation and operations ceased in December 2009, it left an 70 pieces of yarded unmerchantable material in one unit. AR4542. Plaintiffs argue that the Forest Service leaving that material required supplemental NEPA analysis. Pls.' Br. 19. They cite one email that acknowledges that "[l]eaving this material in the woods increases fuel loading." AR4968. The Forest Service left 70 pieces of unmerchantable material because, "[d]ue to . . . no guy trees . . ., yarding of this material may cause resource damage." AR4542. In other words, the Forest Service was protecting the Panamnik District because it could not retrieve that material without guy trees. The FEIS confirms that "[r]emoval of fuels material would have both a positive direct effect and a negative indirect effect," on cultural resources, so "[s]ome site-specific decisions would be made regarding site protection *during and after fuel removal*." AR703 (emphasis added). The Forest Service made a site-specific decision here to protect the cultural resource, so the effects were within the scope of the FEIS and do not require a supplemental EIS.

This decision is consistent with the goal to "reduce surface and low level ladder fuels." AR2314. The Forest Service did not aim to eliminate every single piece of surface and low level ladder fuels, so even if it leaves those 70 pieces, overall, it will still have reduced surface fuels. NEPA does not require the granular analysis that Plaintiffs demand. *Border Power Plant Working Group v. DOE*, 467 F. Supp. 2d 1040, 1063 (S.D. Cal. 2006) ("NEPA review 'must concentrate on the issues that are truly significant to the action . . ., rather than amassing needless detail.'" (quoting 40 C.F.R.

1   § 1500.1(b)).  Finally, even if this were not within the initial scope of the FEIS, these 70 pieces of

2   unmerchantable material left behind can hardly cause a significant impact on the environment.

3       Plaintiffs claim that the Forest Service did not complete the appropriate species surveys for the

4   goshawk, northern spotted owl, or bald eagle.  Pls.' Br. 20-21.  Plaintiffs neither acknowledge the

5   completed surveys that are in the record nor identify any significant environmental effects that

6   required supplemental NEPA.  AR5812, 5814.  For the northern goshawk, the FEIS instructs,

7   "[c]onduct protocol surveys for goshawks to determine occupancy and nesting status and prohibit

8   habitat-modifying activities from March 1 through August 31 if occupied."  AR870.  The Forest

9   Service completed the surveys, and it did not identify any northern goshawks.  AR5814.  For the

10  northern spotted owl, the FEIS directs, "[c]onduct protocol surveys for [northern spotted owl] to

11  determine occupancy and nesting status."  AR869.  It conducted the surveys and located owls.

12  AR5812.  Through these methods, the Forest Service completed its surveys of the northern goshawk

13  and northern spotted owl.

14      The surveys for eagles were only necessary if the Forest Service wanted to operate in certain

15  areas at certain times.  The FEIS ensured that "[n]o activities would occur within the primary

16  disturbance zone or within line of sight of the nest during the breeding season (January 1 to August

17  31)," AR768, because it prohibited operations during that period in specific areas, AR5815 (map),

18  unless it had conducted "protocol surveys" and determined "that the nest is not occupied or has failed."

19  AR870.  The Forest Service lacked sufficient resources to complete those surveys.  AR5822 ("When

20  time allowed, we briefly checked other known territories of . . . Bald Eagles although no detections

21  were observed.").  Because it had not completed those eagle surveys, the Forest Service included an

22  eagle limited operating period provision in the contract.  AR4346 ("No noise generating activities

23  between January 1 and August 31," to "Protect Bald Eagle Habitat").  The contract prohibited Timber

24  Products from generating noise during the eagle's breeding season.  *Id.*  The environmental effects of

25  the Project as implemented were the same as those described in the FEIS.  Indeed, the Project started

26  in November 2009, *see* AR4568; AR4567, and ended in December 2009, AR4976, so it is impossible

27  for the Forest Service to have operated at any time sensitive to the eagles.  Thus, there were no

28

unexpected or significant environmental effects from any lack of eagle surveys.[14]  The Forest Service

has implemented the Project consistent with the NEPA analysis, and no new significant environmental

information has arisen.  The District Court should defer to the agency's conclusion that a supplemental

EIS is not necessary.  *Marsh*, 490 U.S. at 377; *Lands Council*, 537 F.3d at 993.  This Court should

deny Plaintiffs' motion for summary judgment and grant the Forest Service's cross-motion.

> **B.**    The Forest Service analyzed the environmental effects of the Project in the FEIS and ROD.

Plaintiffs argue that the Forest Service "failed to adequately analyze and disclose . . . effects

. . . to the [Panamnik] District" and another unspecified "[c]ultural [a]rea."  Pls.' Br. 21.  As shown

above, in section II.B.1, the Forest Service adequately analyzed the effects on cultural resources.  To

satisfy its obligations under NEPA, the Forest Service need only "cogently explain why it has

exercised its discretion in a given manner . . . ."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto.*

*Ins. Co.*, 463 U.S. 29, 48 (1983); *cf. Mid States Coal. for Progress v. Surface Transp. Bd.*, 345 F.3d

520, 535 (8th Cir. 2003) ("In considering whether the EIS adequately sets forth sufficient information

to allow the decision-maker to make a reasoned decision, we are guided by the rule of reason."

(quotations and alteration omitted)).  Here, the Forest Service acknowledged that the Panamnik

District "has archeological and ethnographic significance as well as spiritual and ceremonial

importance."  AR702, and reasonably explained the effects of the Project on those cultural resources.

For example, it identified that it would "cut[] . . . certain trees proposed specifically by the Karuk

Tribe during consultation" to create "[s]piritual and cultural viewsheds."  AR703.  As shown above,

it understood that "[r]emoval of fuels material would have both a positive direct effect and a negative

indirect effect" on cultural resources.  AR703.[15]

---

[14]  Plaintiffs claim that, because an archaeologist was not present in the past, NEPA required the Forest Service to supplement the EIS.  Plaintiffs can obtain no relief because, once a project is properly analyzed pursuant to NEPA's requirements, the statute does not require the agency to continuously monitor the actual effects of the project and analyze whether they were actually within the scope of the predecisional environmental analysis.  *Marsh*, 490 U.S. at 374. Accordingly, Plaintiffs' claim that the Project is not within the scope of the FEIS purpose and need.  *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 779 (1983) ("NEPA . . . does not create a remedial scheme for past federal actions.  It was enacted to require agencies to assess the future effects of future actions.").

[15]  Plaintiffs also argue that the "failure to survey" "the bald eagle [and] northern spotted owl" meant the "wildlife analysis was based on faulty assumptions."  Pls.' Br. 21.  As shown above, the Forest

(continued...)

DEFS.' BR. IN SUPPORT OF CROSS-MOT. FOR SUMM. J.
Karuk Tribe v. Kelley, No. 3:10-cv-2039-WHA                                    -29-

1        C.        The Project actions are consistent with the FEIS's purpose and need.

2        Plaintiffs use the same effects that they claimed were "new" and "significant" in their argument

3 for a supplemental EIS (*i.e.*, skyline corridor widths, landing sizes, wet weather operations, and

4 incidental hardwood damage),[16] and argue that such effects demonstrate that "the OCFR project is not

5 within the scope of the stated purpose and need." Pls.' Br. 21-23.  This argument has no merit.  As

6 part of the purpose and need, the Project aimed to "[r]educe hazardous fuel accumulations." AR667.

7 The FEIS describes a sophisticated system for removing fuel loads.  *See* FEIS Appx. B (describing

8 the methods and the locations for using those methods), AR833-862.  As another part of the purpose

9 and need, the Project aimed to "[e]nhance cultural values associated with the [Panamnik District]."

10 AR667.  When complete, it will restore "conditions that support cultural burning . . . by lowering the

11 density of surface and ladder fuels that currently prohibit [that] practice." AR704.  It will also "[o]pen

12 the vistas from five viewpoints on the ridge-tops to significant viewsheds." *Id.*  Through these Project

13 components, the Project will accomplish the stated purpose and need.  *State Farm*; *Mid States Coal.*

14                                         **CONCLUSION**

15        When they withdrew their objection, Plaintiffs were satisfied with the Project and had reached

16 accommodation with the Forest Service on their challenges to the Forest Service's pre-ROD

17 determinations.  Plaintiffs are clearly unhappy with the way the Project has progressed, but the Forest

18 Service has been operating within the scope of the FEIS, the ROD, and the Regional PA.  Plaintiffs

19 identify no new, significant impacts requiring any supplemental EIS.  The Court should grant the

20 Forest Service's cross-motion for summary judgment and deny Plaintiffs' motion for summary

21 judgment.

22        Respectfully submitted, March 29, 2011.

23

24                                IGNACIA S. MORENO
                                 Assistant Attorney General

25

26        [15](...continued)
Service completed the survey for the northern spotted owl and acted conservatively when it could not

27 complete the bald eagle survey.  The Forest Service reasonably analyzed these environmental impacts.

28        [16]  Plaintiffs claim that the "cutting of so many large trees" does not meet the HFRA, but they had
specifically disclaimed any HFRA arguments.  Pls.' Br. 1 n. 1, 22.

DEFS.' BR. IN SUPPORT OF CROSS-MOT. FOR SUMM. J.
Karuk Tribe v. Kelley, No. 3:10-cv-2039-WHA                                        -30-

1

2                                          */s/ Jared S. Pettinato*
                                          JARED S. PETTINATO
3                                          SAMANTHA FRANK
                                          Trial Attorneys
4                                          United States Department of Justice
                                          Environment and Natural Resources Division
5                                          Natural Resources Section
                                          P.O. Box 663
6                                          Washington, D.C.  20044-0663
                                          Tel: (202) 305-0203 (Pettinato)
7                                          Tel: (202) 305-0474 (Klein)
                                          Fax: (202) 353-0274
8                                          Jared.Pettinato@usdoj.gov
                                          Samantha.Frank@usdoj.gov
9

10                                         *Attorneys for the Federal Defendants*

11                                         OF COUNSEL:

12                                         ROSE MIKSOVSKY
                                          U.S. Department of Agriculture
13                                         Office of the General Counsel
                                          33 New Montgomery St., 17th Floor
14                                         San Francisco, California  94105

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFS.' BR. IN SUPPORT OF CROSS-MOT. FOR SUMM. J.
Karuk Tribe v. Kelley, No. 3:10-cv-2039-WHA                          -31-

**CERTIFICATE OF SERVICE**

I hereby certify that I have caused the foregoing to be served upon counsel of record through the Court's electronic service system (ECF/CM):

Sharon Duggan at foxsduggan@aol.com

Marianne Dugan at mdugan@mdugan.com

Dated March 29, 2011.

_____
JARED S. PETTINATO
Trial Attorney
United States Department of Justice
Environment and Natural Resources Division
Natural Resources Section
P.O. Box 663
Washington, D.C.  20044-0663
Tel: (202) 305-0203 (Pettinato)
Fax: (202) 353-0274
Jared.Pettinato@usdoj.gov

DEFS.' BR. IN SUPPORT OF CROSS-MOT. FOR SUMM. J.
Karuk Tribe v. Kelley, No. 3:10-cv-2039-WHA                                    -32-