1

2

3

4

5 IN THE UNITED STATES DISTRICT COURT

6

7 FOR THE NORTHERN DISTRICT OF CALIFORNIA

8

9 KARUK TRIBE, KLAMATH-SISKIYOU
WILDLANDS CENTER, ENVIRONMENTAL
10 PROTECTION INFORMATION CENTER,    No. C 10-02039 WHA
and KLAMATH FOREST ALLIANCE,
11
Plaintiffs,
12
**ORDER RESOLVING**
13 v.                                **CROSS-MOTIONS FOR**
**SUMMARY JUDGMENT**
14 TYRONE KELLEY, in his capacity as Forest    **AND TEMPORARILY**
Supervisor, Six Rivers National Forest, and    **ENJOINING PROJECT**
15 THE UNITED STATES FOREST SERVICE,    **IMPLEMENTATION**

16 Defendants.

17 _____/

18                          **INTRODUCTION**

19         In this environmental action, the parties bring cross-motions for summary judgment based

20 on the administrative record.  For the reasons stated below, the federal defendants are entitled to

21 judgment in their favor save and except for one issue, as described below.

22                          **STATEMENT**

23         This action arises from the "preparation, approval, and implementation of the Orleans

24 Community Fuels Reduction and Forest Health Project" in the Six Rivers National Forest

25 (Compl. ¶ 3).  Plaintiffs — a federally recognized Indian tribe and three non-profit environmental

26 advocates — claim that the way this project has been conducted violated federal laws.  Plaintiffs

27 fault the United States Forest Service and the Supervisor of the Six Rivers National Forest for the

28 alleged violations.

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

1        **1.        SCOPE OF THE PROJECT.**

2            The Orleans Community Fuels Reduction and Forest Health Project was undertaken

3    pursuant to the Healthy Forest Restoration Act (AR 656).  The community of Orleans in

4    Humboldt County had been designated a "Community at Risk" from wildfire in the nearby Six

5    Rivers National Forest (AR 663).  The purposes of the HFRA included "reduc[ing] wildfire risk

6    to communities . . . through a collaborative process of planning, prioritizing, and implementing

7    hazardous fuel reduction projects," as well as promoting various aspects of forest health.

8    16 U.S.C. § 6501.  Authority for the Orleans project thus derived from the HFRA, but other

9    federal statutes and regulations also imposed various requirements on the management of

10   the project.

11           The Orleans project was "designed to treat approximately 2,698 acres of forest lands by

12   thinning and/or pruning, hand piling and burning, jackpot burning, yarding tops, and/or

13   understory burning to increase wildfire suppression effectiveness in and around the community of

14   Orleans" (AR 943).  Implementation was projected to take five to ten years (AR 679).  Over two

15   hundred individual treatment "units" were defined within the project area in the Six Rivers

16   National Forest.  The threat of severe wildfire was to be reduced by removing some of the natural

17   materials in these units that could serve as "surface and understory ladder fuels."  Additionally,

18   "vegetation treatments" were to "reduce the density of understory, low- to mid-canopy-level and

19   codominant trees, while promoting the development of large trees."  "Some canopy-level

20   thinning" would be done "to promote the growth of mast-producing hardwoods and diverse forest

21   structures."  These measures were intended to "reduce the probability of crown fires" and reduce

22   "hazardous fuel accumulations."  On the whole, the Orleans project aimed to create fire-resistant

23   forests that would "support the reintroduction of fire-adapted ecosystem functions, including

24   natural, cultural, and prescribed fire" (AR 944).

25           Portions of the project area overlap with portions of the Panamnik World Renewal

26   Ceremonial District, which has cultural and spiritual significance to the Karuk Tribe

27   (AR 822–23).  The Panamnik district was nominated for listing in the National Register of

28   Historic Places in 1987 and has been determined eligible for listing in the Register (AR 4049).  A

United States District Court

For the Northern District of California

1    Karuk spiritual trail called the Medicine Man Trail, which is regularly used by the Karuk Tribe,

2    runs through the Panamnik district.  The Panamnik district and the Orleans project area are

3    roughly the same size, and they have substantial overlap in the vicinity of the community of

4    Orleans.  About half of the Medicine Man Trail runs through or along treatment units of the

5    Orleans project.

6         During the planning phases of the project, Karuk spiritual practitioners were consulted by

7    the Forest Service, and it was determined that the Medicine Man Trail would not be impacted by

8    the project (AR 2072).  According to plaintiffs, however, the project *has* negatively impacted the

9    Medicine Man Trail, as well as other Karuk cultural resources and various aspects of the natural

10    environment in the Six Rivers National Forest, as set forth below.

11         **2.    HISTORY OF THE PROJECT.**

12         The Forest Service proposed the Orleans Community Fuels Reduction and Forest Health

13    project in January 2006 and again in October 2006 (AR 671).  From 2006 to 2008, the Forest

14    Service conducted a "scoping" process with public involvement to determine the scope of issues

15    to be addressed.  Letters were mailed to approximately 125 individuals and groups seeking public

16    comment on the proposal.  A notice of intent was published in the Federal Register, also seeking

17    public comment.  A round-table public meeting and seven public field trips were held.  The Forest

18    Service met with government, industry, and environmental-group representatives during this time.

19    The Forest Service also met with community members, including representatives of the Karuk

20    Tribe (AR 671–72).

21         After the scoping process was complete, the Forest Service began completing the steps of

22    "the NEPA process," which is based on requirements of the National Environmental Policy Act.

23    40 C.F.R. 1506.10.  In March 2008, the Forest Service issued a draft environmental impact

24    statement analyzing the proposed action and no-action alternatives (AR 966).  This publication

25    initiated a formal period for public review and comment during which plaintiffs and others

26    submitted comments on the draft statement.  In June 2008, after the NEPA review and comment

27    period closed, the Forest Service issued a final environmental impact statement (AR 564).  Like

28    the draft statement, the final statement analyzed the possible action and no-action alternatives

United States District Court

For the Northern District of California

regarding the proposed project.  It explained that "[b]ased upon the effects of the alternatives, the responsible official will decide whether the proposed action will proceed as proposed" (AR 658).

In July 2008, plaintiffs and others objected to the final environmental impact statement pursuant to the HFRA objection procedure set forth in 36 C.F.R. 218.7 (AR 622–33).  The objectors met with the Forest Service and participated in a site visit to address the issues raised in the objection.  In August 2008, the objectors and the Forest Service executed a resolution agreement regarding the objection.  Significantly, as part of the agreement, the objectors formally withdrew the objection (AR 644–47).

The following week, the Forest Supervisor of the Six Rivers National Forest signed a Record of Decision announcing "[b]ased upon my review of the alternatives, I have decided to implement Alternative 2 (proposed action) that has been modified through the resolution of the objection process" (AR 944).  Implementation of the project was to begin immediately, "through service contracts, timber sale contracts, and/or stewardship contracts" (AR 948).

In September 2009, the Forest Service contracted with Timber Products Company to implement the project (AR 4319–63).  Commercial logging began on October 30, 2009 (AR 5624).  Plaintiffs soon developed concerns about the work being done by Timber Products and communicated their concerns to the Forest Service (*e.g.*, AR 5406–10).  The Forest Service met with the Karuk Tribe in November and December 2009 to discuss these concerns, and letters were exchanged among the Tribe, the Forest Service, and other agencies during those months (*e.g.*, AR 4892–94).  During that period, the Forest Service modified project implementation by Timber Products to accommodate several of the Tribe's concerns (*e.g.*, AR 4550).

In December 2009, the Forest Service implemented a complete shut-down of work under the contract (AR 4576).  Following suspension of the project, the parties continued to meet and exchange letters but were unable to reach agreement.  The agency's voluntary suspension remains in place, with work having been done in only four of the 238 treatment units within the project area (Burcell Decl. ¶ 8).

\*          \*          \*

United States District Court

For the Northern District of California

1    This action was filed in May 2010, requesting judicial review of Forest Service and Forest

2   Supervisor actions taken in conjunction with the Orleans project.  The complaint alleged seven

3   claims for relief:  two counts for violation of the HFRA, four counts for violation of the NEPA,

4   and one count for violation of the National Historic Preservation Act (Compl. 22–34).  Plaintiffs,

5   however, have since withdrawn their HFRA claims (Dkt. No. 42 at 1 n.1).  Plaintiffs seek

6   declaratory and injunctive relief preventing defendants from proceeding with the Orleans

7   Community project until they have complied with all applicable federal laws (Compl. 34).

8    The administrative record was lodged in September 2010 and supplemented two months

9   later (Dkt. Nos. 25, 36).  It contains over six thousand pages of documents, as well as several

10   collections of maps and photographs filling fourteen four-inch binders.  After the administrative

11   record was completed, cross-motions for summary judgment were filed and fully briefed.  An

12   extensive independent review of the administrative record was conducted, often with a

13   disappointing lack of guidance from the briefs.  In particular, plaintiffs' briefs largely cited

14   merely to defendants' answer to the complaint rather than to the administrative record.  Worse,

15   the cited pleading often did not admit the point for which it was cited.  This order follows a

16   hearing on the motions.

17                                                **ANALYSIS**

18    Plaintiffs seek judicial review of the Orleans project under the Administrative Procedure

19   Act (Compl. ¶ 1).  Judicial review of administrative agency decisions under the APA is based on

20   the administrative record compiled by the agency — not on independent fact-finding by the

21   district court.  *Camp v. Pitts*, 411 U.S. 138, 142 (1973).  Summary judgment shall be granted

22   when "there is no genuine dispute as to any material fact and the movant is entitled to judgment

23   as a matter of law."  FRCP 56(a).  Accordingly, resolution of this APA action by way of summary

24   judgment is appropriate.  *See Nw. Motorcycle Ass'n v. United States Dep't of Agric.*,

25   18 F.3d 1468, 1472 (9th Cir. 1994).

26    The APA "requires that plaintiffs exhaust available administrative remedies before

27   bringing their grievances to federal court."  *Idaho Sporting Cong., Inc. v. Rittenhouse*,

28   305 F.3d 957, 965 (9th Cir. 2002).  The HFRA also provides specific limitations on the judicial

1   review of authorized hazardous fuel reduction projects, such as the Orleans project.  A *party* may

2   challenge such a project in a district court action only if that party has exhausted the

3   administrative review or appeal process, and an *issue* may be considered in the judicial review of

4   the challenged agency action "only if the issue was raised in an administrative review process."

5   16 U.S.C. 6515(c).  The HFRA implementing regulations confirm these requirements.

6   Specifically, "judicial review of hazardous fuel reduction projects that are subject to these

7   procedures is strictly limited to those issues raised by the plaintiff's submission during the

8   objection process, except in exceptional circumstances such as where significant new information

9   bearing on a specific claim only becomes available after conclusion of the administrative review."

10  36 C.F.R. 218.14.

11          Under the APA, a reviewing court shall set aside agency actions, findings, or conclusions

12  found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

13  law" or "without observance of procedure required by law."  5 U.S.C. 706(2).  In reviewing an

14  agency's decision, a court "must consider whether the decision was based on a consideration of

15  the relevant factors and whether there has been a clear error of judgment."  *Marsh v. Oregon*

16  *Natural Res. Council*, 490 U.S. 360, 1378 (1989).  An agency decision will be upheld under the

17  arbitrary-and-capricious standard if the evidence before the agency "provided a rational and

18  ample basis" for its decision.  *Systech Envtl. Corp. v. United States Envtl. Prot. Agency*,

19  55 F.3d 1466, 1469 (9th Cir. 1995).

20          The reviewing court may not substitute its judgment for that of the agency.  *Motor Vehicle*

21  *Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  Yet, the reviewing court

22  also may not merely rubber-stamp administrative decisions.  *Wilderness Watch, Inc. v. United*

23  *States Fish and Wildlife Serv.*, 629 F.3d 1024, 1032 (9th Cir. 2010).  The reviewing court must

24  conduct a "searching and careful" inquiry into the facts.  *Marsh*, 490 U.S. at 378.  Each of

25  plaintiffs' four remaining claims for relief will be considered in turn.

26          **1.      CLAIM FOR FAILURE TO MEET STATED PURPOSE AND NEED (NEPA).**

27          The environmental impact statement for a proposed undertaking must "briefly specify the

28  underlying purpose and need to which the agency is responding in proposing the alternatives

United States District Court

For the Northern District of California

6

**United States District Court**
For the Northern District of California

1   including the proposed action." 40 C.F.R. 1502.13. The environmental impact statement for the

2   Orleans project stated that its purpose was "to manage forest stands to reduce hazardous fuel

3   accumulations and improve forest health around the community of Orleans, while enhancing

4   cultural values associated with the Panamnik World Renewal Ceremonial District" (AR 667).

5   Plaintiffs assert that although the Orleans project was planned to achieve this goal, the project *as*

6   *implemented* "is not within the scope of the stated purpose and need for the project." According

7   to plaintiffs, the failure of the project to meet its stated purpose and need constitutes a NEPA

8   violation (Dkt. No. 42 at 22).

9       Plaintiffs, however, cite no authority for their proposition that the failure of a project to

10  meet its stated purpose and need constitutes a NEPA violation. The NEPA "is a purely

11  *procedural* statute." It "does not mandate particular *results*, but simply provides the necessary

12  process to ensure that federal agencies take a hard look at the environmental consequences of

13  their actions." *Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1070 (9th Cir. 2002)

14  (emphasis added). Thus, an agency action will comply with the NEPA if it was adopted through

15  the proper review and evaluation procedures, regardless of its ultimate impact or outcome. Even

16  if plaintiffs could prove that initial implementation of the Orleans project failed to achieve the

17  project's stated purpose and need, this theory would not establish a NEPA violation.

18      As to the NEPA claim for the alleged failure of the Orleans project to meet its stated

19  purpose and need (count 3), plaintiffs' motion for summary judgment is **DENIED** and defendants'

20  motion for summary judgment is **GRANTED**.

21          **2.    CLAIM FOR FAILURE TO PREPARE A NEW ENVIRONMENTAL IMPACT
               STATEMENT (NEPA).**

22

23      The environmental impact statement for a project must be supplemented if "[t]here are

24  significant new circumstances or information relevant to environmental concerns and bearing on

     the proposed action or its impacts." 40 C.F.R. 1502.9(c)(1)(ii). Plaintiffs claim that the Orleans

25  project *as implemented* "is different from how it was described" in the final environmental impact

26  statement, and that this alleged deviation from the plan is a circumstance that requires defendants

27  to supplement the environmental impact statement (Dkt. No. 42 at 18). Plaintiffs identify a

28

United States District Court

For the Northern District of California

1    variety of ways in which project implementation allegedly exceeded the scope of the

2    environmental impact statement, but plaintiffs' characterization is not supported by the record.

3         *First*, plaintiffs claim that skyline corridors were cut to an average width of twenty to

4    thirty feet, whereas the environmental impact statement limited skyline corridor width to ten feet

5    (Dkt. No. 42 at 19).  The parties agree that the impact statement contemplated a ten-foot width,

6    but they dispute the actual width of the corridors — defendants state that "the skyline corridors

7    are 8 feet wide" (Dkt. No. 43-1 at 25).  Defendants cite evidence that the Forest Service "*marked*

8    an 8-foot wide corridor," but they do not cite any evidence regarding the width of the corridors

9    actually *cut* by Timber Products (AR 4866) (emphasis added).  Plaintiffs' competing figure is an

10   "estimate[]" that was made by a member of the Karuk Tribe and included in a letter written by the

11   tribe and others (AR 5406).  Plaintiffs attempt to bolster this estimate with a declaration and

12   photographic evidence, but the cited photographs are not part of the administrative record and are

13   not visually instructive as to average corridor width (Baker Exh. 1).  The record does not support

14   a finding that the width of the skyline corridors is significantly greater than ten feet.

15        *Second*, plaintiffs claim that the clearings and landings created for equipment were larger

16   than the size evaluated and approved for the project (Dkt. No. 42 at 19).  The environmental

17   impact statement anticipated that clearings for helicopter landings would be one or two acres, and

18   all other landings and disposal sites would be a half acre or smaller (AR 678).  Plaintiffs cite

19   minutes from a 2007 meeting stating that "most of the landings will be [one quarter of an] acre

20   with a few larger ones" (AR 488).  Plaintiffs also cite a contract interpretation document stating

21   that "landing size will need to be anywhere from [one half of an] acre to an acre" (AR 4316).

22   This evidence does not show that the "clearings which have been and will be created" exceed the

23   scope of the analysis in the environmental impact statement, as plaintiffs claim

24   (Dkt. No. 42 at 19).  Moreover, the contract with Timber Products was modified in

25   September 2010 "to establish that landings size will not exceed [one half of an] acre for this

26   project" [*sic*] (AR 5634).

27        *Third*, plaintiffs claim that project implementation has impacted hardwood trees to an

28   extent unanticipated by the environmental impact statement (Dkt. No. 42 at 19).  The statement

described the "desired future condition" to include maintaining "a healthy hardwood component

well into the future" (AR 668).  The statement, however, anticipated the removal of some

hardwoods as part of the project:

> For FVS modeling, we assume that commercial thinning by ground
> or skyline logging systems in early mature and older stands would
> result in 25 percent loss of hardwood trees between 6 and 20
> inches DBH.  In the helicopter harvest units we assume 40 percent
> damage to the hardwoods between 6 and 20 inches DBH and 10
> percent damage to those over 20 inches DBH.  Although these are
> some of the very trees we are trying to save and promote, if we do
> not remove a portion of the overtopping conifers soon, hardwood
> losses would be even greater in the future.

(AR 717–18).  Plaintiffs have not shown that the impact to hardwood trees has exceeded the

percentages assumed in this analysis.  Plaintiffs argue that contractual provisions allowing Timber

Products to profit from felled hardwoods could encourage the unnecessary removal of hardwoods.

Such a financial incentive may be worrisome, but it does not establish that the actual project

implementation has or will exceed the hardwood loss analyzed in the environmental impact

statement.  Plaintiffs also argue that directional felling techniques should have been used to avoid

the loss of certain hardwood trees.  Plaintiffs, however, do not cite any analysis in the

environmental impact statement that would be rendered inapplicable by the loss of those trees

(Dkt. No. 42 at 19).

*Fourth*, plaintiffs claim that "the road has been used for logging activity in wet weather

conditions, causing impacts which were not within the scope of analysis" (Dkt. No. 42 at 20).

Defendants "admit that the contractor used a road for operations in wet weather conditions"

(Ans. ¶ 79(g)).  Plaintiffs, however, do not identify any aspect of the analysis in the

environmental impact statement that would be incompatible with wet-weather road use.  Indeed,

the statement anticipates "wet weather operations" taking place "with appropriate preventive

measures" (AR 867).

*Fifth*, plaintiffs note that the contractor left unmerchantable material on the ground, which

increases fuel loading, contrary to the project goal of reducing hazardous wildfire fuels

(Dkt. No. 42 at 20).  As defendants explained at the time, the contractor was authorized to leave

this material on the ground because the equipment needed to remove it posed a risk to Karuk

cultural resources.  Specifically, the removal equipment required the use of "guy trees" for support, and this technique was curtailed in that location after it was found to be damaging trees along the Medicine Man Trail (AR 4542).  The environmental impact statement recognized that "[r]emoval of fuels material would have both a positive direct effect and a negative indirect effect," and that "[s]ome site-specific decisions would be made regarding site protection during and after fuel removal" (AR 703).  This was one such decision.  Plaintiffs have not shown that the amount of material left on the ground exceeded the scope of the analysis in the environmental impact statement.

*Sixth*, plaintiffs state that "heavy equipment was used in hand units and was parked on a Spiritual Trail," and that "[t]rees were cut in hand units near the Spiritual Trail."  To support this point, plaintiffs cite only defendants' answer to the complaint (Dkt. No. 42 at 20).  Defendants "admit that trees were cut in hand units near the Spiritual Trail" and "admit that heavy equipment was operated in hand units, but deny that those actions were inconsistent with the designations as 'hand units'" (Ans. ¶¶ 60–61).  Plaintiffs do not explain how the use of heavy equipment or the cutting of particular trees allegedly exceeded the scope of the project as contemplated by the environmental impact statement.  In their reply brief, plaintiffs cite a portion of the impact statement providing that "[i]n specific locations where spiritual values or natural resource considerations warrant, unconventional logging techniques would be used" (AR 864).  Plaintiffs, however, do not explain how this provision might be interpreted to exclude heavy equipment from the treatment units in question.

*Seventh*, plaintiffs state that "[t]he contractor used heavy equipment to create log decks of hardwood trees generated in the course of harvesting," and that the log decks were located "directly along the Spiritual Trail."  Again, however, plaintiffs fail to explain how those log decks allegedly exceeded the scope of the analysis in the environmental impact statement (Dkt. No. 42 at 20).

*Eighth*, plaintiffs state that guy-line trees have been cut along the spiritual trail, "directly impacting the Tribe's spiritual and cultural use of the Trail" (Dkt. No. 42 at 20).  Defendants admit they allowed Timber Products to cut guy trees along the spiritual trail and explain how the

United States District Court

For the Northern District of California

**United States District Court**
For the Northern District of California

1   permitted use of guy trees was narrowed over time (Dkt. No. 43-1 at 7–8).  Neither party,

2   however, identifies any aspect of the environmental impact statement relating to the use of guy

3   trees along the spiritual trail.

4   *Ninth*, plaintiffs state that no archaeologist was on site during project implementation

5   (Dkt. No. 42 at 20).  Plaintiffs' only proof of this fact is an unsupported assertion in a letter

6   written by the Karuk Tribe (AR 5423).  Plaintiffs cite a response to one of their comments on the

7   draft environmental impact statement as showing that the final environmental impact statement

8   "promised that an archaeologist would be on site during project implementation"

9   (Dkt. No. 42 at 20, AR 925).  Even if the analysis in the environmental impact statement assumed

10  that an archaeologist would be on site, the mere absence of an archaeologist does not show that

11  environmental *impacts* significantly exceeding those anticipated in the statement

12  actually *occurred*.

13  *Tenth*, plaintiffs claim that species surveys were not completed as specified in the

14  environmental impact statement.  Plaintiffs identify references in the impact statement to surveys

15  of goshawk, northern spotted owl, and bald eagle, and plaintiffs assert that "[t]hese surveys were

16  not done" (Dkt. No. 42 at 21).  After defendants identified goshawk and spotted-owl surveys in

17  the record, plaintiffs shifted position, claiming instead that the wildlife surveys were "inadequate"

18  (Dkt. No. 45 at 5).  The fundamental question at hand, however, is whether implementation of the

19  Orleans project caused significant environmental impacts beyond the scope of those analyzed in

20  the environmental impact statement.  Even if true, the fact that wildlife surveys were not

21  completed or were somehow inadequate would not show that such an impact occurred.

22  *Eleventh*, plaintiffs argue that "because the project does not meet the stated purpose and

23  need regarding fire danger, the [final environmental impact statement] also failed to adequately

24  disclose impacts from increased fire danger" (Dkt. No. 42 at 21).  Plaintiffs, however, have not

25  shown that initial implementation of the Orleans project failed to meet its goals with respect to

26  reducing the risk of wildfire.  Plaintiffs protest the harvesting of large trees with trunk diameters

27  over 24 inches at breast height, but plaintiffs cite no evidence that trees this large actually were

28  harvested (Dkt. No. 42 at 9).  Plaintiffs also protest the unmerchantable material left on the

1    ground, but as explained above, the decision to leave this material was based on informed

2    consideration of conflicting project goals, including the protection of Karuk spiritual resources.

3    Moreover, the environmental impact of this single action, taken in isolation, does not show that

4    the project work as a whole failed (or will fail when completed) to achieve a net effect of

5    reducing the risk of wildfire.

6           At the hearing, plaintiffs emphasized a February 2010 e-mail containing a reference

7    to "40–50% additional volume" (AR 5224).  According to plaintiffs, this email shows that

8    implementation of the Orleans project exceeded its planned scope by 40–50 percent with respect

9    to hardwood trees.  It does not.  The e-mail, written by a member of the Forest Service staff,

10   responds to a colleague's question regarding an "allegation . . . of intentional damage to claim

11   more hardwood volume by sub contractor."  The colleague asks, "Any substance to those

12   charges?" and the author of the email responds, "No substance."  After further addressing that

13   question, the e-mail states:  "On a side note I have added on 40–50% additional volume from

14   corridors.  Unit 1 and Unit 2 have large trees in them.  If I moved the corridor over to avoid large

15   trees then I would hit some more" (*ibid.*).  The most reasonable interpretation of this statement is

16   that the volume addition relates only to the *specific corridors* in the *specific units* being discussed.

17   The e-mail does not establish that the scope of the Orleans project as a whole was increased

18   by 40–50%.

19          Plaintiffs have not carried their burden of showing that implementation of the Orleans

20   project exceeded the scope of the analysis in the environmental impact statement.  It is true that

21   initial project implementation deviated from the ideal contemplated in the planning stages of the

22   project.  That initial work, however, has not been shown to have impacted the environment to a

23   degree unanticipated by the final environmental impact statement.  Because project

24   implementation did not exceed the scope of the environmental impact statement in any

25   meaningful way, there was no need for plaintiffs to supplement the final environmental impact

26   statement.  This order finds that defendants' decision not to issue a supplemental environmental

27   impact statement was not arbitrary, capricious, an abuse of discretion, or otherwise unlawful.

28

United States District Court

For the Northern District of California

As to the NEPA claim for defendants' alleged failure to prepare a new environmental impact statement (count 4), plaintiffs' motion for summary judgment is **DENIED** and defendants' motion for summary judgment is **GRANTED**.

### 3. CLAIM FOR FAILURE TO ADEQUATELY DISCLOSE AND ANALYZE ENVIRONMENTAL IMPACTS (NEPA).

Because the Orleans project was a "major Federal action[] significantly affecting the quality of the human environment," defendants were required to issue a statement on "the environmental impact of the proposed action." 42 U.S.C. 4332(C)(i). Plaintiffs argue that the final environmental impact statement regarding the Orleans project failed to adequately analyze the environmental impacts of the project. According to plaintiffs, the project *as implemented* has impacted the spiritual, cultural, and historical values of the Panamnik district "to an extent that was not acknowledged" in the environmental impact statement (Dkt. No. 42 at 21–22). As explained above, however, plaintiffs have not carried their burden of showing that implementation of the Orleans project caused significant environmental impacts beyond the scope of what the environmental impact statement described. Accordingly, there is no basis for a finding that defendants failed to adequately disclose and analyze the environmental impacts of the Orleans project.

As to the NEPA claim for defendants' alleged failure to adequately disclose and analyze the environmental impacts of the Orleans project (count 2), plaintiffs' motion for summary judgment is **DENIED** and defendants' motion for summary judgment is **GRANTED**.

### 4. CLAIM FOR FAILURE TO CONSULT (NHPA).

As noted, the Panamnik World Renewal Ceremonial District of the Karuk Tribe is eligible for inclusion in the National Register of Historic Places. The parties agree that the Orleans project is a federal undertaking subject to the requirements of National Historic Preservation Act (Ans. ¶ 111). Section 106 of the NHPA provides that the agency conducting such a project must "take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register." 16 U.S.C. 470f. The NHPA implementing regulations parley this provision into specific review and consultation

1    requirements.  Plaintiffs assert that defendants failed to execute their NHPA duties with respect to

2    the Panamnik district in several respects, each of which will be addressed in turn.

3                    **A.    Reliance on Programmatic Agreement.**

4           Before approving expenditures on the Orleans project, defendants were required to

5    complete the regulatory process for complying with Section 106 of the NHPA.

6    36 C.F.R. 800.1(c).  This process includes mandatory consultation with various parties, including

7    the State historic preservation officer.  36 C.F.R. 800.2(a)–(c).

8           Defendants claim to have complied with their Section 106 obligation to consult with the

9    preservation officer by relying on a 2001 Regional Programmatic Agreement among the Forest

10   Service, the preservation officer, and the Advisory Counsel on Historic Preservation.  The

11   programmatic agreement established a "process for compliance with Section 106 of the National

12   Historic Preservation Act for undertakings on the National Forests of the Pacific Southwest

13   Region" and it stated that "these processes will satisfy the Forests' Section 106 responsibilities

14   for all individual aspects of their undertakings" (AR 5491–92).

15          Plaintiffs assert that defendants' reliance on the programmatic agreement was not

16   sufficient to discharge their duty to consult with the preservation officer.  According to plaintiffs,

17   the programmatic agreement does not cover the Orleans project, because the agreement "covers

18   only archeological resources," whereas the project area includes "spiritual resources and other

19   uses" (Dkt. No. 42 at 15).

20          Plaintiffs have forfeited this argument.  The draft and final environmental impact

21   statements both addressed compliance with the NHPA Section 106 consulting requirements in

22   terms of the programmatic agreement (AR 704, 1009).  Thus, plaintiffs were on notice as to

23   defendants' reliance on the programmatic agreement as early as March 2008.  Plaintiffs, however,

24   did not challenge the applicability of the programmatic agreement in their comments on the draft

25   environmental impact statement during the NEPA review and comment period.  Nor did they

26   raise this theory in their HFRA objection to the final environmental impact statement.  Plaintiffs

27   adopted this position for the first time in December 2009 — after project implementation already

28   was underway (AR 5028).  Because plaintiffs did not challenge defendants' reliance on the

United States District Court

For the Northern District of California

programmatic agreement during the administrative review process, they may not now challenge it in district court.

Plaintiffs do not dispute this timing. In response to defendants' waiver and exhaustion arguments, plaintiffs instead re-characterize their claims for relief. Plaintiffs' reply brief states that their claims are based on "new information" and "problems [that] came to light after implementation began," as opposed to actions taken before the record of decision was signed. Specifically, plaintiffs states that their claims are based on the many ways in which they believe "implementation of the project to date has differed drastically from the project as proposed in the [environmental impact statement]" (Dkt. No. 45 at 1). The alleged implementation problems, however, have nothing to do with the question of whether defendants' reliance on the programmatic agreement satisfied their Section 106 consultation obligations. Defendants' reliance on the programmatic statement is not an *implementation* issue. In shifting focus to implementation, plaintiffs tacitly acknowledge that their reliance theory does not belong in this action.

Plaintiffs could have, but did not, challenge defendants' reliance on the programmatic agreement during the administrative review process. Accordingly, they are not entitled to judicial review of that aspect of the Orleans project. 36 C.F.R. 218.14.

**B.    Compliance with Programmatic Agreement.**

The regulatory process for complying with Section 106 of the NHPA includes provisions for the resolution of adverse effects. In particular, if a memorandum of agreement is executed to resolve adverse effects from a project, then the project must be "carried out in accordance with the memorandum of agreement." 36 C.F.R. 800.6(c).

Putting aside the question of whether the programmatic agreement was *sufficient* for compliance with Section 106, plaintiffs note that the agreement set forth "Standard Resource Protection Measures" (AR 5514–19). According to plaintiffs, these standard resource protection measures were not taken with regard to the Panamnik district. Plaintiffs argue that defendants' alleged failure to implement these measures violated the NHPA, because the Section 106 process for resolution of adverse effects requires fidelity to such agreements (Dkt. No. 42 at 18).

United States District Court

For the Northern District of California

Defendants made a good faith effort to utilize the standard resource protection measures. Some of the standard measures, such as exclusion of culturally sensitive areas from the project, were included in the contract with Timber Products (AR 4343–44, 5514).  More specific measures were outlined as instructions on the treatment unit information cards for units that overlap with the Panamnik district (*e.g.*, AR 4516–17).  When defendants learned that the contractor's operations had adversely impacted Karuk cultural resources despite these precautions, defendants took steps to mitigate the impact and enforce the contractor's obligation to implement the protection measures (*e.g.*, AR 4547, 4564).

Plaintiffs cite a May 2010 e-mail from the Heritage Program Manager of the Six Rivers National Forest admitting that "our undertaking did result in adverse effects to TCPs/Historic Properties, and we failed to implement standard protection measures identified in the NEPA analysis" (AR 5394).  This e-mail is plaintiffs' only evidence of defendants' alleged failure to comply with the programmatic agreement (Dkt. No. 42 at 18).  Plaintiffs do not identify any specific measures they believe should have been implemented, but were not.  The standard resource protection measures enumerated in the programmatic agreement are to be implemented "as appropriate," but plaintiffs do not identify which measures would be appropriate for the Orleans project (AR 5514).  Plaintiffs simply point to one sentence in an e-mail.

Plaintiffs have not identified any decision or act by defendants that violated their duty to conduct the Orleans project in accordance with the programmatic agreement.  Although the Panamnik district was adversely affected during the first several weeks of project implementation, defendants cannot be said to have ignored the standard resource protection measures set forth in the programmatic agreement.  Accordingly, this theory does not entitle plaintiffs to relief on their NHPA claim.

### C.      Eligibility Determination Update.

The NHPA implementing regulations impose identification duties on an agency conducing a project that potentially could impact a historic site.  For a property whose eligibility for listing in the National Register of Historic Places has never been evaluated, the agency must determine whether the property is eligible or ineligible.  For a property whose eligibility has been

United States District Court
For the Northern District of California

1    determined previously, the agency may in some circumstances need to re-evaluate the

2    determination of eligibility or ineligibility.  The regulations set forth these requirements

3    as follows:

4        In consultation with the SHPO/THPO and any Indian tribe or
         Native Hawaiian organization that attaches religious and cultural
5        significance to identified properties and guided by the Secretary's
         standards and guidelines for evaluation, the agency official *shall*
6        apply the National Register criteria (36 CFR part 63) to *properties
         identified within the area of potential effects that have not been
7        previously evaluated for National Register eligibility*.  The passage
         of time, changing perceptions of significance, or incomplete prior
8        evaluations *may* require the agency official to reevaluate
         *properties previously determined eligible or ineligible*.

9

10   36 C.F.R. 800.4(c)(1) (emphasis added).  The regulations do not specify when "[t]he passage of

11   time, changing perceptions of significance, or incomplete prior evaluations" would or would not

12   require reevaluation of a prior eligibility determination.

13       The Panamnik district, which has cultural and spiritual significance to the Karuk Tribe,

14   was determined eligible for listing in the Register in 1978 (AR 4049).  Plaintiffs argue that the

15   subsequent identification of "many new sites, uses, information, and/or impacts" within and

16   adjacent to the Orleans project area rendered the original evaluation "incomplete" and triggered

17   an obligation for defendants to revisit and update the eligibility determination.  According to

18   plaintiffs, defendants' failure to reevaluate the Panamnik district and update its eligibility

19   determination violated the NHPA (Dkt. No. 42 at 17).

20       Like the challenge to defendants' reliance on the programmatic agreement, this theory

21   could have been, but was not, timely raised with the Forest Service.  Although plaintiffs

22   participated in the scoping process, submitted comments during the NEPA review period, and

23   filed an HFRA objection, plaintiffs never requested reevaluation of the Panamnik district's

24   eligibility for listing in the Register during those phases of project planning.  Indeed, plaintiffs

25   raised this issue for the first time in January 2010 — after project implementation already had

26   begun and been halted for other reasons.  Plaintiffs' request for reevaluation is not based

27   specifically on information that came to light during implementation, but rather more generally on

28   information identified "since the original determination of eligibility in 1978" (AR 5090).  If

     plaintiffs believed that developments over the last few decades required the Forest Service to

United States District Court

For the Northern District of California

1   update the eligibility determination for the Panamnik district before proceeding with the Orleans

2   project, then plaintiffs should have spoken up about this issue before project implementation

3   began.  Their failure to do so precludes judicial review of this aspect of the Orleans project.

4   36 C.F.R. 218.14.

5                    **D.      Evaluation and Mitigation of Impacts.**

6          The NHPA implementing regulations also require agencies to evaluate and mitigate any

7   adverse effects a project may have on historic properties.  36 C.F.R. 800.5–800.7.  The parties

8   agree that the Orleans project adversely impacted the Medicine Man Trail and other historical

9   aspects of the Panamnik district during the first several weeks of project implementation.

10  Plaintiffs argue that defendants have "not taken steps to mitigate that harm, thereby violating" the

11  NHPA (Dkt. No. 42 at 16).

12                   **(1)      Remedial Mitigation of Actual Impacts.**

13         Plaintiffs assert that "[i]n general the tribe's concerns have been dismissed out of hand and

14  to plaintiffs' knowledge, the contract has not been modified nor other mitigation measures taken

15  to date."  Plaintiffs provide only one example of this supposed problem:  "tribal requests to move

16  the log decks impacting the ceremonial trail were ignored" (Dkt. No. 42 at 16).  Plaintiffs cite a

17  January 2010 letter from the Karuk Tribe to the *state* historic preservation officer stating that this

18  request was first made in November 2010 but that the logs were still present (AR 5423).  The

19  record, however, does not support a finding that *federal* defendants ignored plaintiffs' concerns.

20  On the contrary, once defendants were alerted to the adverse impacts resulting from project

21  implementation, they swiftly put into place a variety of measures to evaluate and mitigate

22  the impacts.

23         In response to the Karuk Tribe's initial implementation concerns, federal defendants

24  investigated the nature and extent of the impacts.  They found that the Medicine Man Trail and

25  some of the surrounding trees had been damaged by logging equipment, and that downed

26  materials had been piled in the vicinity.  They consulted with the Tribe, the historic preservation

27  officer, and concerned members of the public on how best to mitigate these impacts

28  (AR 4921, 5623–31).  As early as November 2009, they began working with Timber Products to

1    alter work methods so that continued work would be done in ways that would not damage the

2    spiritual trail and surrounding trees (*e.g.*, AR 4550, 4564).  In December 2009, defendants

3    reviewed the "stand cards" for all the project treatment units and updated them to more clearly

4    indicate culturally sensitive resources (AR 5031–32, 5035).  Defendants also sent an

5    archaeologist to consult with Timber Products on-site about protecting the spiritual trail

6    (AR 4547).

7            Ultimately, on December 21, 2010 — less than two months into implementation of the

8    five- to ten-year project — defendants suspended all operations.  The suspension notice explained

9    that work was stopped so that plaintiff's concerns could be further resolved before any further

10   implementation of the project took place:

11               You are to suspend work for the following reason(s):  The
              Government requires time to re evaluate [*sic*] the project and any
12               potential consequences of a variety of issues recently brought to its
              attention.  A complete shut-down will allow an indepth [*sic*]
13               review of the project and help ensure successful completion.  It is
              understood that this suspension may have impacts that will be
14               discussed at a future date.

15   (AR 4576).  Defendants took the major step of halting project implementation shortly after the

16   adverse impacts came to light and several months before plaintiffs filed this action.

17           It is true that the Panamnik district was adversely impacted during the first several weeks

18   of implementation of the Orleans project.  Plaintiffs may not be satisfied with the speed or extent

19   of the remedial mitigation measures that were taken in response to those impacts, but plaintiffs'

20   satisfaction is not the legal standard by which defendants' acts are to be reviewed.  The

21   administrative record does not support plaintiffs' claims that their concerns were ignored.

22   Plaintiffs have not identified any acts or omissions by defendants that constitute a failure to

23   evaluate or mitigate known adverse impacts as required by the NHPA.

24                    **(2)    Preventative Mitigation of Potential Impacts.**

25           Plaintiffs also argue that certain *preventative* mitigation measures should have been but

26   were not put in place.  In particular, plaintiffs emphasize that some of the mitigation measures to

27   which the Forest Service agreed during the planning process were not included in the contract

28   with Timber Products (*e.g.*, AR 4819).  Plaintiffs also cite evidence that some archaeological

United States District Court

For the Northern District of California

1    reports were incomplete at the time the service contract was executed, and that some maps and

2    information cards did not list certain cultural resources (AR 4776, 4810, 5000).

3        As the agency conducting the project, defendants had discretion regarding how best to

4    implement any agreed preventative mitigation measures.  The contract with Timber Products

5    described certain widely applicable mitigation measures, and it established general procedures to

6    be followed regarding "areas identified as needing special measures for the protection of cultural

7    resources."  The contract placed upon Timber Products "a general duty to protect all known and

8    identified resources," and it warned that not all locations and protection measures may be

9    described in the contract or designated on the ground (AR 4343).  These provisions serve to alert

10   signatories to the contract that protection of cultural resources is a sensitive issue.  Defendants'

11   decision to avoid a boilerplate, exhaustive list of every theoretical prevention measure was not

12   arbitrary, capricious, or unfounded.

13       There are limits, however, on defendants' discretion to select methods for communicating

14   the cultural constraints on the Orleans project to those who ultimately perform the project work.

15   At a minimum, the set of adopted methods — such as contract provisions, information cards, and

16   flagging — must be adequate to communicate to the contractor and its employees what

17   precautions are required.  The specific agency acts identified by plaintiffs may be justifiable in

18   isolation, but the initial work done by Timber Products shows that, on the whole, the message did

19   not get through.  For example, the Forest Service and the Karuk Tribe reached an agreement that

20   guy trees would not be used above the road in treatment units 1 and 2, but Timber Products used

21   guy trees in these areas anyway (AR 2473, 4783, 4562).

22       Without determining whether sloppiness, poor decision-making, or improper motivations

23   might explain the communication failure, this order finds that the set of communication methods

24   adopted by defendants was not adequate to inform Timber Products that certain preventative

25   mitigation measures were imperative.  This failure to follow through constitutes a violation of

26   defendants' NHPA responsibility to evaluate and mitigate potential adverse impacts.

27                        *            *            *

28

20

As to the NHPA claim (count 1), both motions for summary judgment are **GRANTED-IN-PART** and **DENIED-IN-PART**.  Regarding the theory that defendants violated the NHPA by failing to adequately implement preventative mitigation measures, plaintiffs' motion is **GRANTED** and defendants' motion is **DENIED**.  Regarding all other NHPA violation theories, plaintiffs' motion is **DENIED** and defendants' motion is **GRANTED**.

## CONCLUSION

As to all three NEPA claims (counts 2–4 in the complaint), plaintiffs' motion is **DENIED** and defendants' motion is **GRANTED**.  As to the NHPA claim (count 1 in the complaint), both motions are **GRANTED-IN-PART** and **DENIED-IN-PART**.  Regarding the theory that defendants violated the NHPA by failing to adequately implement preventative mitigation measures, plaintiffs' motion is **GRANTED** and defendants' motion is **DENIED**.  Regarding all other NHPA violation theories, plaintiffs' motion is **DENIED** and defendants' motion is **GRANTED**.

\*          \*          \*

In light of the finding that defendants violated the National Historic Preservation Act, defendants are hereby **ENJOINED** from conducting further implementation of the Orleans Community Fuels Reduction and Forest Health Project until appropriate remedial measures are established to bring the project into compliance.  Defendants shall submit a proposed remedial plan by **NOON ON AUGUST 1, 2011.**  Plaintiffs may file a response to the proposal within **TWO WEEKS** of its submission.  The plan then will be evaluated based on those submissions unless oral argument is found to be necessary, and if the plan is satisfactory the injunction will be lifted.  In the meantime, the parties are strongly encouraged to work toward a solution at a June meeting before the July meeting they have planned.  A further case management conference is hereby **SET** for **11:00 A.M. ON SEPTEMBER 1, 2011**.

**IT IS SO ORDERED.**

Dated:  June 13, 2011.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

**United States District Court**
For the Northern District of California